[No. S034110. Aug. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK CHRISTOPHER CREW, Defendant and Appellant.

Counsel

Lynne S. Coffin, State Public Defender, under appointment by the Supreme Court, and Andrew S. Love, Assistant State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Dane R. Gillette, Assistant Attorneys General, and Peggy S. Ruffra, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**KENNARD, J.**—A jury convicted defendant Mark Christopher Crew of one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of grand theft (§§ 484, 487). The jury found true a special circumstance allegation that the murder was carried out for financial gain. (§ 190.2, subd. (a)(1).) Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239.)

## I. FACTS AND PROCEEDINGS

### A. *Guilt Phase*

#### 1. *Prosecution's case*

Defendant met Nancy Jo Wilhelmi Andrade (Nancy), a nurse, at the Saddle Rack bar in San Jose in 1981, shortly after Nancy's divorce. Nancy owned a purebred horse and a Ford pickup truck. Nancy and defendant were romantically involved until November or December of 1981, after which they did not see each other until April of 1982, when they resumed the relationship.

In January 1982, when Nancy and defendant were not romantically involved, Nancy and her friend Darlene Bryant planned a trip across the United States for the summer, and that spring Nancy bought a yellow Corvette for the trip. In May 1982, Richard Elander, one of defendant's best friends, began work at a ranch in Utah run by Richard Glade. Before Elander left for Utah, defendant had talked to him about killing Nancy during a trip across the country. While in Utah, Elander asked Glade about carrying a body into the wilderness of the Utah mountains. Disturbed by the conversation, Glade fired Elander.

Defendant asked Nancy to move to Greer, South Carolina, where defendant's mother and stepfather lived. When Nancy replied she did not want to

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

move so far away unless married, defendant agreed to marry her. The wedding took place on June 4, 1982.

The marriage soon floundered. Nancy was living with Darlene at the latter's home, but defendant was rarely there. Nancy twice saw defendant with some women at the Saddle Rack bar. She told several friends she was thinking of an annulment of the marriage.

Defendant had been romantically involved with Lisa Moody, to whom he proposed marriage in June 1982, the same month he married Nancy. Defendant and Moody did not set a date for the wedding.

In July 1982, defendant and his friend Richard Elander moved to Greer, South Carolina, where they stayed with defendant's parents and started a truck service business. That same month, Nancy and her friend Darlene took their planned vacation trip across the country. They stopped in Greer, South Carolina, and Nancy spent the night with defendant.

After Nancy's visit to South Carolina, defendant and his stepfather, Bergin Mosteller, decided to return to California to kill Nancy. Defendant discussed with Elander different ways of killing her, including suffocation, hitting her with a large wrench, and "bleeding her in the shower so she wouldn't make any mess." They also discussed leaving her body in the Utah wilderness, where they could bury her or "hang her in a tree, let the bears eat her."

After returning to California in early August 1982, Nancy often spoke on the telephone with defendant. She decided to move to South Carolina in an effort to make the marriage work, and she began to make arrangements to do so. She gave custody of her two children from a prior marriage to their father and closed out her bank account, obtaining $10,500 in cash and a money order for $2,500. When Deborah Nordman, one of Nancy's friends, remarked that Nancy might be left in the desert during the trip with defendant to South Carolina, Nancy replied, "If you don't hear from me in two weeks, send the police."

On August 21, 1982, defendant and his stepfather came to Darlene's house, where Nancy was living, in a station wagon pulling a horse trailer. They loaded Nancy's belongings into the trailer and picked up Nancy's horse from a stable in Gilroy. The plan was for Mosteller to drive the station wagon to Texas, where he would leave the horse with relatives. Nancy and defendant would follow in Nancy's Corvette and truck. They would leave the truck in Texas, where defendant's friend, Richard Elander, would retrieve the truck, the horse, and Nancy's belongings and take them all to South Carolina. Nancy and defendant would then leave Texas in Nancy's Corvette to go on a

two-week honeymoon. Mosteller, however, never went to Texas. He boarded the horse in a stable in San Jose, drove to Nevada, and finally flew to South Carolina.

On August 23, Nancy and defendant went to Nancy's parents' home in Santa Cruz, California, where they picked up Nancy's dog and some of her belongings, including a microwave, stereo components still in the original cartons, and personal documents. That same day, Nancy and defendant ostensibly left for South Carolina.

That same night, however, defendant checked into a Motel 6 in Fremont, California, where he registered to stay for two nights. The next day, he arrived at the home of Lisa Moody, the woman who had accepted defendant's marriage proposal shortly after his marriage to Nancy. Over the next two days, defendant gave Lisa a stereo and a microwave, took her to see a horse in a San Jose stable, and arranged for her to convert $5,000 in cash into a cashier's check payable to Bergin Mosteller, defendant's stepfather.

On August 28, 1982, defendant and Lisa left for South Carolina in a pickup truck with a horse in a trailer. They stopped in Texas, where they stayed at defendant's grandmother's house for a couple of days. While there, defendant became upset and agitated after receiving a phone call. After defendant and Lisa arrived in Greer, South Carolina, defendant opened a bank account in which he deposited Nancy's $2,500 money order. Elander and Mosteller sold Nancy's clothing and possessions at a flea market for about $500, burned her documents in a backyard, and sold the horse trailer and Nancy's horse.

Defendant and Lisa returned to San Jose in mid-September. Defendant then sold Nancy's truck for $4,200, giving the purchaser a certificate of title with Nancy's forged signature. On October 13, 1982, defendant told Lisa that the phone call he received in Texas while they were at his grandmother's house was about a woman who loved him and was telling people in South Carolina she was going to marry him. According to defendant, the woman went to the head of the Mafia in Arizona to complain about defendant, but the Mafia killed her instead. Defendant told Lisa that he was forced to dispose of the body to avoid being blamed for the woman's death, and that he buried it in his friend Bruce Gant's backyard. The phone call defendant had received in Texas was actually from Gant who told him that the "body was beginning to stink." That same day, defendant returned to South Carolina in Nancy's Corvette.

Richard Elander testified under a grant of immunity. He said that on the day defendant and Lisa arrived in Greer, South Carolina, defendant told him the details of Nancy's killing. According to Elander, after defendant and

Nancy left San Jose, California, they stopped and walked up a hillside into the woods. While Nancy and defendant were sitting on the hillside talking, defendant shot her in the back of the head and rolled the body down a ravine where he covered it with blankets. Defendant then drove one of the cars to Bruce Gant's house in Campbell, California. Defendant and Gant returned to the scene and retrieved the other vehicle.

The next evening, defendant and Gant got drunk and returned to the site where defendant had shot Nancy. When defendant walked down to her body, it had moved. Defendant "freaked out," ran back to the truck, and told Gant. Gant went down the ravine where he tried to strangle Nancy and break her neck. He eventually cut off Nancy's head. Defendant told Elander that they put Nancy's body in a 55-gallon drum filled with cement and buried it in Gant's backyard. They put her head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge between Alameda and San Mateo Counties, California.

A few days after defendant returned to South Carolina, Elander testified, he sold Nancy's Corvette to Marion Mitchell. When Mitchell repeatedly asked for title to the car, Elander told him that defendant had killed his wife by shooting her, cutting off her head, putting the body in a barrel filled with concrete, and burying it in a backyard. Elander then forged defendant's signature on a bill of sale and gave it to Mitchell.

In January 1983, defendant made arrangements to stay in Connecticut with Jeanne Meskell, with whom he previously had a relationship. While there, defendant told Meskell that he had killed a girl, that she was in two pieces in two drums filled with cement, and that one drum was in the San Francisco Bay and one was in a backyard. In March 1983, the San Jose police searched Bruce Gant's house, where they recovered a Tiffany lamp identical to one of Nancy's. A search of Gant's yard with steel probes in March 1983 and again in 1984 did not reveal anything. Nancy's body was never found.

2. *Defense case*

The defense at the guilt phase consisted primarily of challenges to the credibility of the prosecution witnesses. The defense introduced evidence that Elander was an untrustworthy drug addict who had engaged in "lying contests" with defendant and that a woman with blonde hair and a dog had come to the San Jose stable with defendant. Because Nancy had blonde hair and owned a dog, the evidence was introduced to try to show that Nancy was aware that Mosteller had taken her horse to the San Jose stable. The defense also introduced evidence to raise doubts over the burial of Nancy's body in Gant's backyard in Campbell, California. San Jose Police Officer Demowski

testified that officers searched Gant's backyard three times without finding Nancy's body. District attorney investigator Ronald McCurdy testified that he could not find any records tying Gant to the crime or the disposal of the body.

## B. *Penalty Phase*

### 1. *Prosecution case*

The prosecution did not introduce any additional evidence in its case-in-chief at the penalty phase.

### 2. *Defense case*

The parties stipulated defendant had no prior felony convictions.

Defendant's father, William Crew, testified that defendant was born in Fort Worth, Texas in 1954. The family moved to Novato, California, in 1957 and to Petaluma, California, in 1966. During this time, defendant did well in school and was involved in sports. Defendant was never physically abused as a child.

Defendant's parents began to experience marital difficulties. His mother became noncommunicative and withdrawn. In 1969, defendant's parents divorced; defendant and his father moved to San Jose. Defendant continued to do well in school.

In 1970, when defendant was 15 years old, defendant's father married Barbara Martin. Defendant did not get along with his stepmother and one of her three children. When defendant's father and stepmother bought a home, his stepmother's children were each given a bedroom while defendant had to sleep on a couch. Defendant's grades in school began to decline. When he was 17 years old, defendant quit high school and joined the Army.

Defendant did well in the Army. He became a squad leader in charge of 12 to 14 men, rose to the rank of sergeant, and became the driver for Colonel Donald Pearce, the base commander. While he was in the Army, defendant married Patty, his high school girlfriend, and they had one daughter. When a friend and fellow enlistee, James Gilbert, was getting in trouble because of his drinking, defendant showed concern and compassion for him. Before his honorable discharge from the Army in 1976, defendant and Patty divorced.

Thereafter, defendant married Debra Lunde and they moved to Minnesota. When his marriage to Debra ended in 1981, defendant moved to Texas, where he lived with and took care of his grandmother, Irene Watson, who was

suffering from cataracts. In 1978, defendant returned to California, where he worked as a truck driver and attended junior college. He then became involved with Emily Bates, whom he treated well.

Part of the testimony of two witnesses, Richard Elander and Kathy Harper, actually given during their guilt phase testimony, was referenced at the penalty phase as well as mitigating evidence about defendant's background. That testimony consisted of Elander's testimony that defendant protected and cared for him when Elander was a young man strung out on drugs. And Kathy Harper testified that when she was financially destitute, defendant moved in with her and provided financial support for her and her son.

Emily Bates testified at the penalty phase that she had a relationship with defendant in 1977 and again in 1980. Defendant treated her well.

Defendant's father, William Crew, asked the jury to spare his son's life because as an intelligent and capable person he could lead a productive life in prison by doing assigned tasks.

Defendant's grandmother, Irene Watson, testified that defendant took care of her for two or three months in 1981 when she was in ill health.

James Gilbert, defendant's friend whom defendant had helped while they were in the Army, described defendant as a caring and generous person.

Colonel Pearce, the base commander for whom defendant was the assigned driver while in the Army, said that defendant was intelligent, dependable, full of common sense, and mature. He described defendant as a top soldier. In his view, defendant should not be put to death because he could lead a productive life in prison by, for instance, teaching auto repair.

The defense also presented evidence from three Santa Clara County Sheriff's Deputies (Ron Yount, Toby Council, and Donald Varnado) who had daily contact with defendant during the four years he spent in the Santa Clara jail awaiting trial. According to them, defendant interacted well with prisoners and staff. Deputy Varnado mentioned that defendant prevented trouble by telling him about a plan by male inmates to overpower a female officer. All three deputies were of the view that if sentenced to life in prison, defendant could lead a productive life by helping other inmates and doing assigned tasks.

Jerry Enomoto, the former head of the California Department of Corrections and an expert on prisons, expressed the view that defendant would not be a high-security risk in prison. His opinion was not changed by defendant's

alleged participation in a 1985 escape attempt, because it involved an unsupervised outdoor area and was based on informant statements; because the district attorney concluded there was insufficient evidence to prosecute defendant; and because the plan did not involve weapons, violence, or the taking of hostages.

### 3. *Prosecution rebuttal*

Clinton Williams, an informant, testified that in 1985, while in the county jail with defendant, the latter discussed an escape plan, which involved cutting a hole in the surrounding fence. Defendant said he wanted to escape because he thought he would be found guilty of the first degree murder of a woman whose body was buried in an orchard outside California.

## II.  PRETRIAL PROCEEDINGS

### A.  *Territorial Jurisdiction*

Defendant contends his conviction must be reversed because California courts lacked territorial jurisdiction over the murder charges. He argues that there is no evidence that he killed or prepared to kill Nancy within the State of California, and that the trial court erred in not submitting the factual question of the location of the murder to the jury. He argues these errors violated his federal constitutional due process rights under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227] by arbitrarily depriving him of a state-created liberty interest. We disagree.

■ California courts have criminal jurisdiction over anyone who commits a crime in whole or in part within this state and over anyone who commits a crime outside California if the defendant formed the requisite intent within this state and committed any act, including preparatory acts, showing that the crimes were initiated within California. (§§ 27, 778a; *People v. Morante* (1999) 20 Cal.4th 403, 434, 437–438 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) Territorial jurisdiction may be established by circumstantial evidence. (*People v. Cavanaugh* (1955) 44 Cal.2d 252, 262 [282 P.2d 53].)

■ The evidence is sufficient here to establish California jurisdiction. Preliminary plans for the murder took place in California. Nancy was last seen alive on August 23, 1982, when she left her parents' house in Santa Cruz with defendant. That evening, defendant checked into a motel in Fremont, California. The next day, defendant arrived at Lisa Moody's house, also in Fremont, and he gave her property belonging to Nancy. The evidence also indicates that Nancy was killed in California because wherever defendant killed Nancy, the location was close enough to Campbell, California, for defendant in one

day to have driven from the murder scene to Richard Gant's house in Campbell, returned to the scene of the murder with Gant to get the other vehicle, and then drive back to Gant's house. In addition, the evidence showed that Gant, in whose backyard the evidence indicated Nancy's body was buried for at least some period of time, telephoned defendant in Texas to complain that the body was starting to smell. There was thus ample evidence the killing occurred in California.

Defendant faults the trial court for not instructing the jury on its own initiative to determine whether the killing occurred in California. He argues that the court had a duty to do so, because territorial jurisdiction involves a general principle of law closely and openly connected to the facts, and in this case a defense supported by substantial evidence.

Defendant's contention assumes that territorial jurisdiction is a factual question for the jury. We need not decide that issue here. The trial court's duty to instruct on general principles of law and defenses not inconsistent with the defendant's theory of the case arises only when there is substantial evidence to support giving such an instruction. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) Substantial evidence is evidence of reasonable, credible value. Here, defendant's theory that Nancy could have been killed in a state other than California is based on speculation, not substantial evidence.

Evidence that defendant and others discussed the possibility of killing Nancy and disposing of her body in the wilderness of Utah or elsewhere during a trip across country pertained merely to discussions, not events. By contrast, the above described evidence of events in California, such as when Nancy and defendant left Santa Cruz, when defendant checked into a hotel in Fremont, how defendant traveled to and from the scene of the crime with Gant, and Gant's later telephone call to defendant in Texas shows that Nancy's murder occurred in California. There is no evidence to the contrary.

Because defendant did not have a state-created right to instructions on territorial jurisdiction, the trial court did not violate his due process rights under *Hicks v. Oklahoma, supra,* 447 U.S. 343, by not giving such instructions on its own initiative.

B. *Venue*

Defendant contends Santa Clara County was not the proper venue to try his case. He argues there is no evidence the killing occurred in Santa Clara County, pointing out that under section 790 venue for murder is in the "county where the fatal injury was inflicted or the county in which the injured party died or in the county in which his or her body was found."

■      Defendant concedes section 790 must be read together with section 781. (*People v. Price* (1991) 1 Cal.4th 324, 385 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Section 781 provides that when a public offense is committed in part in one jurisdiction and in part in another jurisdiction "or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories," venue is proper in either jurisdiction. Section 781 is liberally construed to permit trial in a county where only preparatory acts occurred. (*People v. Price, supra,* at p. 385.)

Defendant argues there is no evidence that any preparatory acts took place in Santa Clara County. We disagree. There is evidence that defendant formed the intent to kill Nancy while in Santa Clara County, because he discussed doing so with Elander in that county. The evidence also supports the conclusion that the events culminating in Nancy's death arose and occurred at least in part in Santa Clara County. Defendant picked Nancy up at her friend's apartment in San Jose, Santa Clara County, where they loaded her belongings into the trailer and her car. The fateful trip began at the San Jose apartment from which defendant and Nancy left to go to her parents' house in Santa Cruz and from which they drove through Santa Clara County to a hotel in Fremont, Alameda County, where within a day or two, and perhaps as shortly as within a few hours after passing through Santa Clara County, defendant killed Nancy. A "public offense may be tried in a jurisdiction in which the defendant made preparations for the crime, even though the preparatory acts did not constitute an essential element of the crime." (*People v. Price, supra,* 1 Cal.4th at p. 385.)

We need not here address defendant's argument that the issue of the appropriate venue was a factual question for the jury. Defendant did not request a jury instruction on venue. Accordingly, just as in our recent decision in *People v. Simon* (2001) 25 Cal.4th 1082, 1109 [108 Cal.Rptr.2d 385, 25 P.3d 598], "[w]e have no occasion to address that issue here because, even were we to assume that a defendant is entitled to have the question of venue submitted to the jury when the issue has been preserved and the defendant has timely tendered an adequate proposed instruction, in the present case defendant failed to tender such an instruction."

## III.   GUILT PHASE

### A.   *Corpus Delicti*

Defendant challenges his murder conviction on the ground that the corpus delicti rule was not satisfied. We have summarized the rule as follows: " 'In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or

admissions of the defendant. [Citations.] ■ The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm. [Citation.] Proof of corpus delicti need not be beyond a reasonable doubt; a slight or prima facie showing is sufficient. [Citation.]' (*People v. Diaz* (1992) 3 Cal.4th 495, 528–529 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) The identity of the perpetrator is not an element of the corpus delicti." (*People v. Kraft* (2000) 23 Cal.4th 978, 1057 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Defendant argues that when his extrajudicial statements are excluded from consideration, the remaining evidence is insufficient to support a reasonable inference that Nancy is dead and that her death was caused by a criminal agency.

We conclude that the prosecution established the corpus delicti of the murder. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1127 [124 Cal.Rptr.2d 373, 52 P.3d 572].) For instance, the prosecution presented evidence that Nancy's contacts with her friends abruptly stopped after she left San Jose with defendant. For 20 years, Nancy had telephoned her friend Jeanette St. John on August 24, Jeanette's birthday. She promised to call another friend, Nilda Houseman, every other week after her arrival in South Carolina. Shortly before her disappearance, Nancy told Deborah Nordman to call the police if Nordman had not heard from her in two weeks. In addition, shortly after Nancy's disappearance, defendant sold Nancy's truck, car, horse, and clothes, and spent her money. This evidence is more than sufficient to support a reasonable inference that Nancy is dead and her death was the result of a criminal agency. (*People v. Mattson* (1990) 50 Cal.3d 826, 874–875 [268 Cal.Rptr. 802, 789 P.2d 983].) Thus, the prosecution sufficiently established the foundation for the admission of defendant's extrajudicial statements. (*Id.* at p. 874.)

## B. *Prosecutorial Misconduct*

The trial court granted defendant's motion in limine to exclude testimony that Nancy said she feared defendant, ruling that the evidence was more prejudicial than probative and also was inadmissible hearsay. (Evid. Code, §§ 352, 1250.) The defense withdrew its objection to the admissibility of testimony by a witness that in that person's opinion Nancy was afraid of defendant. The court denied defendant's request to exclude Nancy's statement to Deborah Nordman to call the police if Nordman did not hear from Nancy in two weeks after she left for South Carolina.

During his opening statement, the prosecutor said: "Nancy had told her [friend] that she was very apprehensive about the move [to South Carolina]. Not only the move, but apprehensive of the defendant, fearful of the

defendant. She had told one of her friends, 'if you don't hear from me in two weeks, call the police.' " The defense did not object to this statement. After a lunch recess and before the prosecution resumed its opening statement, defense counsel pointed out that the prosecutor, "inadvertently perhaps," had referred to Nancy's statements of fear. The prosecutor responded that his recollection was that he said Nancy feared defendant, not that Nancy *said* she feared defendant. The prosecutor added that "if I raised it where it sounded like a statement, I didn't mean to. And I have instructed the witnesses regarding that." Defense counsel then commented: "[I]t wasn't sufficient to interrupt the [prosecutor's opening] statement. I want to make it clear that can't come out again."

Later, during the prosecution's direct examination of Deborah Nordman, Nancy's friend, this colloquy occurred:

"Q. And do you recall the last conversation you had with [Nancy] about not going [to South Carolina with defendant]?

"A. Yes.

"Q. What did you tell her?

"A. Well, she expressed some concern and some fear, and basically she said to me 'if you don't hear from me in two weeks, send the police.'

"Q. What did you tell her before that?

"A. I told her if she had fear, reservations or that, you know, first of all, she should not take the children because if anything was going to happen, she didn't want, didn't feel she should have the children involved. And I—and I also told her that if she had the fear, and up until that point—"

The defense then objected on the ground the trial court had ruled that Nancy's statements of fear were inadmissible. After both counsel agreed that was indeed the court's ruling, the court told the prosecutor to proceed. After Nordman's testimony, defense counsel argued that Nordman, in violation of the court's order, had testified that Nancy told Nordman she was afraid. The prosecutor asserted that Nordman's remarks were nonresponsive and that he had instructed her not to testify as to Nancy's fear. Defense counsel then asked the court to give the jury a cautionary instruction. The court told counsel to prepare one. The next day, the court gave this instruction prepared by the defense:

"The court: Ladies and Gentlemen, before the next witness is called, I wanted to read this cautionary instruction regarding evidence of fear.

"You are not to consider any testimony or evidence that Nancy Jo Crew may have expressed either fear or apprehension of the defendant Mark Crew as evidence that Mark Crew either killed Nancy Jo or that she is dead.

"Such evidence may only be considered for the limited purpose of establishing whether or not it was likely that Nancy Jo Crew would have traveled to South Carolina with Mark Crew."

■ It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. (*People v. Silva* (2001) 25 Cal.4th 345, 373 [106 Cal.Rptr.2d 93, 21 P.3d 769].) It is also misconduct for a prosecutor to make remarks in opening statements or closing arguments that refer to evidence determined to be inadmissible in a previous ruling of the trial court. Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823 & fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Also, a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. (*People v. Scott* (1997) 15 Cal.4th 1188, 1217 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

Defendant has failed to preserve for appeal the issue of prosecutorial misconduct in the prosecutor's opening statement to the jury. He did not object or request an admonition. In addition, the prosecutor's brief misstatement was not prejudicial to defendant in view of the evidence later introduced against him and the above described cautionary instruction prepared by defense counsel.

The prosecutor did not engage in misconduct in connection with Nordman's testimony. Nordman's first answer did refer to Nancy's statement that she feared defendant. The answer, however, was not responsive to the question the prosecutor had asked. The question was what Nordman said to Nancy, not what Nancy said to her. There is nothing in the record to show that the prosecutor elicited or attempted to elicit testimony in violation of the court's order. The prosecutor's next question likewise asked what Nordman had said to Nancy, not what Nancy had said to Nordman, and the answer given did not refer to statements made by Nancy. Moreover, the court later admonished the jury as the defense requested. Under these circumstances, it

is not reasonably probable that the jury would have reached a result more favorable to the defendant in the absence of the misconduct.

## C. *Victim Hearsay Statement*

Defendant contends that Deborah Nordman's testimony that murder victim Nancy had told her, "If you don't hear from me in two weeks, send the police," was inadmissible hearsay, and that in any event the trial court should have excluded the testimony as unduly prejudicial under Evidence Code section 352. We disagree.

The statement was admissible. Even if viewed as hearsay (see Evid. Code, § 1200) the statement was within the state-of-mind exception to the hearsay rule. It was also relevant and not unduly prejudicial, as discussed below.

Evidence Code section 1250 states an exception to the hearsay rule for statements of a declarant's then existing state of mind. It provides that such statements are admissible as an exception to the hearsay rule when offered either to prove the declarant's state of mind when the declarant's state of mind is itself in issue or the evidence is offered to prove or explain acts or conduct of the declarant. (*Id.*, subd. (a)(1), (2).)

The statement was admissible under Evidence Code section 1250, subdivision (a)(2) to explain Nancy's conduct. The defense presented the theory that Nancy disappeared of her own accord because she was a troubled person suffering from stress and depression. Nancy's statement to Nordman to send the police if she was not heard from in two weeks was admissible as evidence that Nancy did not disappear on her own. (*People v. Noguera* (1992) 4 Cal.4th 599, 620–622 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Because the statement was evidence of Nancy's state of mind to explain her conduct concerning going with defendant, it was also relevant. (Evid. Code, § 210.)

Because the testimony was probative on whether Nancy's disappearance was of her own volition, its evidentiary value was not substantially outweighed by the danger of undue prejudice under Evidence Code section 352. Prejudice for purposes of section 352 refers to evidence that tends to evoke an emotional bias against the defendant. (*People v. Karis* (1988) 46 Cal.3d 612, 637–638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Contrary to defendant's assertion, the prejudice, if any, of the statement about calling the police if Nordman did not hear from Nancy in two weeks did not outweigh its probative value because it followed Nordman's nonresponsive answer that Nancy said she feared defendant. Evidence of Nancy's fear of defendant was introduced independent of the statement by Nordman.

## D.  *Claims of Improper Admission of Evidence*

### 1.  *False statements of Bergin Mosteller*

The prosecution introduced evidence that on August 22, 1982, defendant's stepfather, Bergin Mosteller, drove to Reno, Nevada. There, he left his car at the airport and traveled to Boulder City, Nevada, where he told the police he had been robbed that morning of his money and his car. Mosteller then flew to South Carolina, where on August 27, 1982, he made an insurance claim for the loss of his car, stating that he had been on a sales trip to Texas but had detoured to drop off his stepson and a woman named Lisa in Los Angeles and Twentynine Palms, California. Defense counsel objected to this evidence as hearsay and as more prejudicial than probative. The prosecutor argued that the statements were not hearsay because they were not offered for the truth of the matter asserted, and that they were more probative than prejudicial because they showed Mosteller trying to establish an alibi for himself because he was aware that defendant was going to kill Nancy. The trial court, without mentioning the hearsay objection, ruled that the evidence was admissible as more probative than prejudicial, but also that the prosecutor could not introduce evidence of the false statements concerning the facts of the alleged robbery.

The evidence in question was not hearsay.  ■  A statement is hearsay if it is made other than by a witness while testifying and is offered to prove the truth of the matter asserted. (Evid. Code, § 1200.) The statements were not admitted to prove that Mosteller was the victim of a robbery; they were offered to prove that Mosteller tried to establish an alibi for himself and thus must have known that defendant was going to commit a crime. As defense counsel conceded at trial, the statements were relevant: They had a tendency in reason to prove that Mosteller believed he needed to establish a false alibi, thereby providing circumstantial evidence that he knew that defendant, whom he had just left, intended to engage in a criminal act. Nor did the trial court abuse its discretion in ruling that the prejudicial effect of the evidence did not substantially outweigh its probative value. (Evid. Code, § 352.) The evidence of Mosteller's false reports was not unduly prejudicial because it would not arouse an emotional bias against defendant in the jury.

### 2.  *Bruce Gant's statement to Nancy's father*

At a hearing outside the jury's presence (Evid. Code, § 402), the trial court ruled admissible the proposed testimony of Jake Wilhelmi, Nancy's father, regarding a statement Bruce Gant made to him about the location of Nancy's body. Wilhelmi then testified before the jury that on May 9, 1984, he telephoned Gant and asked him for the location of his daughter's body so he

could give her a decent burial. At the end of the conversation Gant told him that he "might as well forget about trying to find" Nancy, that he "couldn't get within a hundred yards of her, and that the U.S. Government didn't have enough money to excavate her." Defense counsel objected that the testimony was hearsay and that the risk of undue prejudice outweighed its probative value. The prosecutor argued the statement was admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250) and as a declaration against interest (*id.*, § 1230).

We need not determine if the statement was hearsay because any error in admitting the statement was harmless. The jury was quite aware that Nancy's body was never found. As the jury already knew that the body was never found, the testimony that Gant said it was useless for Nancy's father to look for her body did not unduly prejudice defendant.

### 3. *Doug Crew's testimony*

Defendant's stepbrother Doug Crew testified that defendant said to him: "Doug, I've done so many things. I think I would like to kill someone, just to see if I could get away with it." Doug Crew further testified that defendant probably made the statement in April, May, or June of 1982. Defendant argues the trial court should have sustained his objection to the statement on the ground it was more prejudicial then probative because the statement made no reference to a specific victim and because it was too remote in time.

■ A generic threat is admissible "where other evidence brings the actual victim within the scope of the threat." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757 [230 Cal.Rptr. 667, 726 P.2d 113].) Here, other evidence brings Nancy within the scope of defendant's threat. Richard Elander testified that before May 1982, when he went to work at the ranch in Utah, defendant had talked about killing Nancy. Elander also testified that in August 1982, he and defendant discussed various ways of killing Nancy. The evidence of defendant's statement to his stepbrother, Doug, while damaging to defendant's case, was not unduly prejudicial. ■ Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt. (*People v. Karis, supra,* 46 Cal.3d at p. 638.)

### 4. *Elander's statement to Glade*

Richard Elander and Richard Glade both testified that near the end of May 1982, they discussed disposing of a woman's body in the rugged Utah mountains. Defendant did not object to either Elander's or Glade's testimony. Defendant now contends that the evidence was irrelevant because it was not

tied to defendant, was not within the coconspirator exception to the hearsay rule, and was more prejudicial than probative.

Because he did not object to the testimony, defendant has failed to preserve the issue for appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 740 [47 Cal.Rptr.2d 165, 906 P.2d 2].) In any event, the testimony was admissible. Elander testified that he believed he gave Glade the name of the person who wanted to kill a woman. Glade testified that he recalled Elander's mentioning defendant's name in the conversation. Thus, contrary to defendant's contention here, both Elander and Glade linked defendant to the conversation.

### 5. *Evidence of prior consistent statement*

Marion Mitchell testified that in the fall of 1982, he bought a yellow Corvette from defendant, that the car was part of a divorce settlement, and that defendant promised to give Mitchell title to the car after that divorce was final. Mitchell repeatedly asked Elander where defendant was. Elander eventually told Mitchell that defendant was not coming back to South Carolina because he had killed his wife, that defendant shot her but when he went back to the scene she had crawled off, and that defendant cut off her head, put her body in a barrel filled with cement, and buried her in someone's backyard. Defense counsel objected to the testimony as hearsay.

Defendant contends Mitchell's testimony should not have been admitted. Not so. The testimony was admissible as a prior consistent statement of Elander's. ▪ Evidence of a previous statement made by a witness is admissible under the prior consistent statement exception to the hearsay rule if there has been an express or implied charge that the witness's testimony is recently fabricated and the prior consistent statement was made before the motive for fabrication is alleged to have arisen. (Evid. Code, §§ 1236, 791.) In evaluating the admissibility of prior consistent statements, the focus is on "the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive." (*People v. Noguera, supra*, 4 Cal.4th at p. 630.)

In his opening brief, defendant relies essentially on his attack on Elander's credibility during cross-examination in light of Elander's immunity agreement with the prosecution. In response, the Attorney General pointed out that Mitchell's testimony referred to a time before the immunity agreement. In his reply brief, defendant relies on cross-examination challenging Elander's credibility based on lies Elander told police, and on his claim that Elander had a motive to fabricate when Elander made the statements to Mitchell because he knew the police were then looking for defendant and Elander was concerned about the police investigation. Defendant's cross-examination of

Elander sought to impeach Elander's testimony implicating defendant based on false statements Elander had made to the police during the investigation. Because Elander's statement to Mitchell preceded the police inquiries and investigation, Mitchell's testimony was admissible as a prior consistent statement by Elander. Defendant does not cite any challenge at trial to Elander's purported motive to fabricate based on knowledge that the police were investigating. Accordingly, Mitchell's testimony was admissible.

Because Mitchell's testimony served to rehabilitate an impeached prosecution witness, Elander, the trial court did not abuse its discretion in determining that the probative value of the testimony outweighed its prejudicial effect.

### 6. *Testimony about bloody blanket*

Kathy Harper, who lived in a house trailer with defendant between October and December 1982, testified that she once entered the trailer when defendant and Elander were there. They abruptly stopped talking, but not before she heard one of them, although she could not recall which one, mention "a bloody blue blanket" and say "I got sick." At an in camera hearing, defense counsel stated "we have no problem" with Harper's testimony about the conversation. Defendant now contends the testimony concerning the blanket was irrelevant and unduly prejudicial.

By not objecting, defendant failed to preserve the issue for appeal. (*People v. Medina, supra,* 11 Cal.4th at p. 740.) In any event, the admission of the testimony was harmless. Elander testified that defendant said he covered Nancy's body with a blanket after he shot her. Harper's testimony was brief and added very little to the evidence against defendant.

### E. *Victim Impact Evidence*

Stacey Andrade, Nancy's daughter, was 19 years old at the time of trial, but 12 years old when her mother disappeared. Andrade testified that she was close to her mother, that she had wanted to live with her mother and move to South Carolina, and that when Nancy left for South Carolina Nancy indicated she would come back for Andrade around Christmas. She further testified that she and her mother did "mother-daughter things," including horseback riding. At the conclusion of Andrade's testimony, the court asked her, "[H]ow are you getting along now?" She responded by saying that she had seen a counselor because of the trauma in her life, that she was going to college, that her mother taught her to be the best she could be, and that the loss of her mother "put [her] back a lot," because she really needed her mother during her teenage years. The court then commented: "[T]hat's a tremendous loss for a young lady to suffer. But seems to me that you're making the best of things." The court told Andrade to "keep up the good work."

Defendant contends this testimony by Andrade should not have been admitted because it had minimal probative value and was extremely inflammatory and prejudicial. Defendant argues the trial court's colloquy with Andrade at the end of her testimony exacerbated the prejudice. We disagree.

Defense counsel failed to preserve this issue for appeal because he did not object at trial to Andrade's testimony or to the judge's comments. Also, Andrade's testimony was directly relevant to and highly probative of whether Nancy met with foul play or, as the defense suggested, had disappeared of her own accord.

## F. *Instructional Error*

### 1. *CALJIC No. 2.11.5*

Defendant contends the trial court erred in instructing the jury under CALJIC No. 2.11.5. That instruction tells the jury not to discuss or to consider why a person who may have been involved in the crime is not being prosecuted. (Here, Richard Elander, who may have participated in the crime, was granted immunity from prosecution.)

We have held that this instruction should be clarified or not given when a nonprosecuted participant testifies at trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 162 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Williams* (1997) 16 Cal.4th 153, 226 [66 Cal.Rptr.2d 123, 940 P.2d 710].) We have further held, however, that the giving of CALJIC No. 2.11.5 is not error when it is given together with other instructions that assist the jury in assessing the credibility of witnesses. (*People v. Lawley, supra,* at p. 162.) That occurred here, where the trial court instructed the jury it could consider any evidence of witness credibility, including the existence or nonexistence of a bias, interest, or other motive (CALJIC No. 2.20), and to consider the instructions as a whole (CALJIC No. 1.01). (See *People v. Williams, supra,* at p. 227.) In addition, in closing argument to the jury, defense counsel expressly mentioned Elander's grant of immunity as a ground for impugning Elander's testimony. (See *People v. Hardy* (1992) 2 Cal.4th 86, 190–191 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

### 2. *Proximate cause*

Richard Elander testified that defendant told him that the evening after defendant had shot Nancy, defendant and Gant got drunk and returned to the scene of the shooting. Defendant told Elander that when he walked down to the body, it had moved, and that Nancy appeared to still be alive. Defendant then "freaked out and ran back up to the truck and was telling [Gant] about it,

and [Gant] went down and tried to strangle [Nancy] and break her neck, and finally ended up cutting her head off." Defendant contends that this evidence establishes that the causation instructions given the jury were erroneous, misleading, and incomplete, and created an impermissible mandatory presumption of causation.

The trial court told the jury that the unlawful act must be the proximate cause of the death and that proximate cause is a cause that "in natural and continuous sequence, produces the death, and without which the death would not have occurred." The court further instructed, in the language of CALJIC No. 3.41, that there may be more than one proximate cause; that when two or more persons' acts contribute concurrently as a proximate cause, each person may be criminally liable if that person's conduct was a substantial factor contributing to the result; and that a cause is concurrent if it was "operative at the time of the murder and acted with another cause to produce the murder."

The trial court here, however, modified CALJIC No. 3.41 by adding this language: "If you are convinced beyond a reasonable doubt that Mark Crew shot his wife but you are not certain beyond a reasonable doubt that the shot was the proximate cause of her death, you must find Mark Crew not guilty of murder unless you believe the evidence proves beyond a reasonable doubt that Mark Crew directed, aided, or encouraged another to kill Nancy Crew. [¶] If the evidence shows that Nancy Crew was killed by someone other than Mark Crew, and you have reasonable doubt as to whether or not Mark Crew directly aided by act or advised this person to kill Nancy Crew, you must find Mark Crew not guilty of the crime of murder." In addition, the court instructed the jury on the criminal liability and definition of an aider and abettor. (CALJIC Nos. 3.00, 3.01, 3.03.)

Defendant contends the trial court erred in giving the then standard proximate cause instruction, CALJIC No. 8.55, because that instruction is "virtually identical" (*People v. Roberts* (1992) 2 Cal.4th 271, 313 [6 Cal.Rptr.2d 276, 826 P.2d 274]) to an instruction this court disapproved in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872]. (*People v. Roberts, supra,* at p. 313.) Any error was harmless. (*People v. Catlin* (2001) 26 Cal.4th 81, 156–157 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Any possible jury confusion engendered by the use of the term "proximate" could only benefit defendant. This court's concern with the term "proximate" in *Mitchell* was that it could mislead a jury into viewing the legal requirement of causation as more *limited* than it is. (*Catlin, supra,* at p. 157.) Thus, here, as in *Catlin,* any ambiguity in the instruction could not have caused a juror who otherwise thought defendant's acts were not a cause of Nancy's death to conclude that defendant nevertheless proximately caused her death. (*Ibid.*)

Defendant argues the trial court should have instructed the jury that Gant's actions in strangling Nancy and then cutting off her head could be an independent intervening cause breaking the causal connection between defendant's shooting of Nancy and her death. Not so. To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. (*People v. Schmies* (1996) 44 Cal.App.4th 38, 50 [51 Cal.Rptr.2d 185].) The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. (*Ibid.*) Here, a jury could not possibly have found that Gant's attempt to make sure Nancy was dead was unforeseeable.

Moreover, any error was harmless under any standard because here it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent any error. (See *People v. Nguyen* (2000) 24 Cal.4th 756, 765 [102 Cal.Rptr.2d 548, 14 P.3d 221].) Even if Gant's actions could be described as an independent intervening cause of Nancy's death, they would relieve defendant of criminal liability only if the jury found that his shooting Nancy in the head was not a concurrent cause of her death. No reasonable jury could have found that the shot defendant fired into Nancy's head was not a concurrent cause of her death.

Finally, defendant contends the proximate cause instruction creates a constitutionally impermissible mandatory presumption because it tells the jury that a proximate cause is one that "in natural and continuous sequence" produces the death, thereby precluding consideration of intervening causes. Not so. When there is an intervening cause, the initial cause is not one that continues to operate in a natural and continuous sequence.

### 3. *Reasonable doubt and evidentiary instructions*

Defendant challenges 11 standard jury instructions that the trial court gave. Four of the instructions, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, told the jurors that they must accept a reasonable interpretation of evidence over an unreasonable one. Defendant contends these instructions would have misled the jury into finding him guilty if it decided defendant reasonably appeared guilty, rather than finding him not guilty if it entertained a reasonable doubt about his guilt. As defendant concedes, we have previously rejected this contention. (*People v. Mendoza* (2000) 24 Cal.4th 130, 181 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We do so again here.

Defendant points out that four of the instructions, CALJIC Nos. 1.00, 2.01, 2.51, and 2.52, referred to "guilt or innocence." This phrase, he argues,

relieved the prosecution of its burden of proof by implying that the issue was one of guilt or *innocence* instead of whether there was or was not a reasonable doubt about defendant's guilt.     ▇▇▇     Challenges to the wording of jury instructions are resolved by determining whether there is a reasonable likelihood that the jury misapplied or misconstrued the instruction. (*People v. Clair* (1992) 2 Cal.4th 629, 662–663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Here, it is not reasonably likely that the jury would have misapplied or misconstrued the challenged instructions, one of which expressly reiterates that defendant's guilt must be established beyond a reasonable doubt. (CALJIC No. 2.01.) The instructions in question use the word "innocence" to mean evidence less than that required to establish guilt, not to mean the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt. (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1493 [46 Cal.Rptr.2d 645].) Here, the jury was repeatedly instructed on the proper burden of proof. (E.g., CALJIC Nos. 2.90, 4.21, 8.71.)

Defendant contends three other jury instructions improperly lessened the prosecution's burden of proof. The first of those stated that a witness willfully false in part of his or her testimony was to be distrusted in other parts of the testimony. (CALJIC No. 2.21.2.) We have in the past rejected such a challenge when the defendant is the witness. (*People v. Beardslee* (1991) 53 Cal.3d 68, 94–95 [279 Cal.Rptr. 276, 806 P.2d 1311].) The challenge has even less force when, as here, the witness is other than the defendant. Second, defendant challenges the instruction that the jury should not decide guilt or innocence based on the number of witnesses but on the convincing force of the evidence. (CALJIC No. 2.22.) This instruction addresses the jury's evaluation of evidence, not the burden of proof. Defendant's third challenge is to CALJIC No. 8.20. This instruction requires the jury to find the killing was preceded by a clear and deliberate intent to kill that must have been formed upon preexisting reflection and not precluded by conditions that negate deliberation. There is no reasonable likelihood that any jury would misconstrue this instruction as lessening the prosecution's burden of proof in any respect.

### 4. Instructions on consciousness of guilt

The trial court instructed the jury that the flight of a person immediately after the commission of a crime is not sufficient to establish guilt but may be taken into consideration. (CALJIC No. 2.52.) It also instructed the jury not to consider an effort to procure false evidence for the defendant's benefit unless the jury finds that the defendant authorized the effort, and that even then the conduct by itself is not sufficient to prove guilt. (CALJIC No. 2.05.) Defendant contends these instructions are impermissible "pinpoint" instructions to consider specific pieces of evidence against him. We have in the past

rejected such a challenge (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]), and we do so again here.

Defendant further contends the consciousness of guilt instructions should not have been given here because there was insufficient evidence of flight or procuring false evidence. There was adequate evidence that after Nancy's murder defendant fled from California to Texas and South Carolina. With respect to the instruction on procuring false evidence, the Attorney General argues it was supported by testimony that defendant instructed his stepfather, Bergin Mosteller, to tell Nancy's parents that Mosteller had thrown defendant and Nancy out of the house for using drugs and that they had gone to Florida. Defendant counters that the evidence of what Mosteller said was too remote to be probative of procuring false evidence for trial. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1139 [36 Cal.Rptr.2d 235, 885 P.2d 1] [instruction on fabricating evidence does not require existence of judicial proceedings].) In any event, any error was harmless under any standard. At most, the instruction was superfluous. (*People v. Jackson, supra,* 13 Cal.4th at p. 1225.)

### G.  *Jury Inquiry About Limited Admissibility of Evidence*

On the third day of deliberations, the jury asked the trial court if it was "possible to obtain a list of evidence that was presented for limited purpose?" After conferring with counsel for the parties, the court responded: "Evidence received for a limited purpose: 1. Portions of the testimony of: (a) Tanis Palmer (b) Debbie Nordman (c) Darlene Bryant (d) Jake Wilhelmi (e) Lisa Moody. 2. Exhibits 17 and 17A." Defendant contends the trial court should have also told the jury that the testimony of Mitchell and Glade, admitted under the prior consistent statements exception to the hearsay rule, was admitted for the limited purpose of evaluating Elander's credibility.

Defendant's argument assumes that prior consistent statements are admissible only to support the credibility of a witness and not for the truth of the matter stated. Such statements, however, are admissible for both purposes. (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1236, p. 239.)

### IV.  SPECIAL CIRCUMSTANCE

The jury found true the special circumstance allegation that defendant murdered Nancy for financial gain. (§ 190.2, subd. (a)(1).) Defendant challenges the finding on the grounds that (1) the evidence is insufficient to support it, (2) it is overbroad, (3) the jury was improperly instructed on the special circumstance, and (4) the special circumstance is unconstitutionally vague and violates the prohibition against ex post facto laws.

A. *Insufficiency of Evidence*

Relying primarily on *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994], defendant asserts that the financial-gain special circumstance applies only when the victim's death was an essential prerequisite to the financial gain or the defendant had an expectation that the murder was necessary to obtain the financial gain. He contends the evidence is insufficient to support the finding that Nancy's death was an essential prerequisite to the financial gain or that he had an expectation that the murder was necessary to obtain the financial gain.

Defendant's reliance is misplaced. In *People v. Bigelow, supra,* 37 Cal.3d at page 738, the jury found four special circumstances: murder for financial gain, murder to avoid arrest or perfect an escape, murder while engaged in the commission of a robbery, and murder in the course of a kidnapping. We held in *Bigelow* that in the situation of multiple special circumstances, adopting a limiting construction of the financial-gain special circumstance was appropriate to avoid overlap among the special circumstances. "In this context, we believe the court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant. Such a limiting construction will not prejudice the prosecution, since there will remain at least one special circumstance—either financial gain or felony murder—applicable in virtually all cases in which the defendant killed to obtain money or other property. We adopt a limiting construction under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Id.* at p. 751.)

Later, in *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279] and in *People v. Noguera, supra,* 4 Cal.4th 599, this court held that the limiting construction of the financial-gain special circumstance of *People v. Bigelow, supra,* 37 Cal.3d at page 751, does not apply when there is no overlap among the special circumstances actually charged. "*Bigelow*'s formulation should be applied when it is important to serve the purposes underlying that decision, but . . . it is not intended to restrict construction of 'for financial gain' when overlap is *not* a concern." (*People v. Howard, supra,* at p. 410, original italics.) When, as in *Howard, Noguera,* and this case, only one special circumstance is charged, there is no risk of multiplicity of special circumstances, and thus the limiting construction of *Bigelow* does not apply. (*People v. Noguera, supra,* at p. 635; *People v. Howard, supra,* at p. 410.)

In the absence of overlap among the charged special circumstances, "the relevant inquiry is whether the defendant committed the murder in the

expectation that he would thereby obtain the desired financial gain." (*People v. Howard, supra,* 44 Cal.3d at p. 409, fn. omitted.) It is not required that the murder be committed exclusively or even primarily for financial gain. (*People v. Jackson, supra,* 13 Cal.4th at p. 1229; *People v. Noguera, supra,* 4 Cal.4th at p. 636.) Nor, contrary to defendant's argument, is there any requirement that the killing be the only means of obtaining the financial gain. ▪ The standard is whether the "purpose" of the murder was to obtain financial gain, "whether or not achievable." (*People v. Howard, supra,* at p. 410, fn. 10.)

Also off point is defendant's argument that if the *Bigelow* limiting construction precludes robbery and burglary from forming the basis of the financial-gain special circumstance, his conviction for grand theft must likewise preclude the jury from also finding the financial-gain special circumstance allegation true. As we have explained, however, the *Bigelow* limiting construction applies only when there are overlapping special circumstances charged, something that does not exist here. ▪ The same evidence can be used to prove both the crime of theft and the financial-gain special circumstance when, as here, the evidence shows defendant's expectation of financial gain at the time of the murder.

In determining the validity of a challenge to a criminal conviction on the ground of insufficient evidence, this court reviews " 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The same standard applies to special circumstance allegations." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

The evidence here is sufficient to support the jury's finding. Just before she left California for South Carolina with defendant, murder victim Nancy closed out her bank accounts, obtaining $10,500 in cash and $2,500 in the form of a money order. Within a day or two of her disappearance, defendant arranged for Lisa Moody (the woman to whom defendant proposed marriage shortly after his marriage to Nancy) to convert $5,000 into a cashier's check payable to his stepfather. Defendant then opened a bank account in South Carolina and there deposited Nancy's $2,500 money order. He thereafter sold Nancy's clothing, personal possessions, horse, horse trailer, truck and Corvette. From this evidence, a reasonable jury could find beyond a reasonable doubt that defendant killed Nancy with an expectation of financial gain.

### B. *Overbreadth*

Defendant contends the financial-gain special circumstance is unconstitutionally overbroad because it does not permit the jury to make a principled distinction between those who deserve the death penalty and those who do not. He argues that California's financial-gain special circumstance would apply to any murder "where there is any possibility of a financial effect upon a defendant." We have previously rejected this claim. (*People v. Noguera, supra,* 4 Cal.4th at p. 636; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1].) We do again here.

### C. *Inadequate Instruction Claim*

The trial court instructed the jury that to find the special circumstance true the jury must find that the murder was intentional, that it was carried out for financial gain, and that defendant believed the death would result in financial gain. (CALJIC No. 8.81.1.) Defendant challenges the instruction as unconstitutionally vague. As defendant concedes, we have in the past upheld an identical instruction (*People v. Jackson, supra,* 13 Cal.4th at pp. 1228–1229) and we have repeatedly held that the instruction in the statutory language is proper (e.g., *People v. Padilla* (1995) 11 Cal.4th 891, 934 [47 Cal.Rptr.2d 426, 906 P.2d 388]).

We have in the past rejected defendant's argument that a trial court commits prejudicial error by instructing in the language of CALJIC No. 2.51 that motive is not an element of the crime charged. There is no reasonable likelihood that the jury would have applied the motive instruction to the special circumstance allegation. (*People v. Noguera, supra,* 4 Cal.4th at p. 637.)

### D. *Vagueness and Ex Post Facto Claims*

Defendant challenges the financial-gain special circumstance as vague, arguing that it violates due process because persons of common intelligence must necessarily guess at its meaning. We have in the past rejected a similar challenge. In *People v. Howard, supra,* 44 Cal.3d at page 410, this court held

that "financial gain" is not a technical term, obviating any need for further refinement of the phrase absent a showing of confusion resulting from use of the term. We thus reject defendant's claim that the financial-gain special circumstance is impermissibly vague or overbroad on the ground that persons must guess at its meaning. (*People v. Edelbacher, supra,* 47 Cal.3d at p. 1025.)

We also reject defendant's contention that the financial-gain special circumstance is unconstitutionally vague on the ground that a defendant would have no reason to be on notice or understand that the adoption of the 1978 death penalty law changed the definition of financial gain contained in the 1977 law that it superseded. The 1977 financial-gain special circumstance provided: "The murder was intentional and was carried out pursuant to agreement by the person who committed the murder to accept a valuable consideration for the act of murder from any person other than the victim . . . ." (Stats. 1977, ch. 316, § 9, p. 1257.) The 1978 financial-gain special-circumstance provision reads: "The murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) Defendant's contention is belied by a comparison of the statutory language. In any event, the murder in this case was committed in 1982.

Defendant further contends that the application of the financial-gain special circumstance here would have the unconstitutional effect of an ex post facto law. He argues that this court's decisions after *People v. Bigelow, supra,* 37 Cal.3d 731, cannot be retroactively applied to expand the financial-gain special circumstance. He claims this is so because later judicial construction of the statute was "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (*Bouie v. City of Columbia* (1964) 378 U.S. 347, 354 [12 L.Ed.2d 894, 900, 84 S.Ct. 1697].) We reject defendant's contention.

■ The due process clause, not the ex post facto clause, bars retroactive application of a judicial construction of a criminal statute that is unexpected and indefensible by reference to the law expressed before the conduct in issue. (*People v. Martinez* (1999) 20 Cal.4th 225, 238 [83 Cal.Rptr.2d 533, 973 P.2d 512].)

We reject defendant's claim that the due process clause requires application of what defendant characterizes as the "narrow construction as stated in *People v. Bigelow*." Defendant killed Nancy in 1982, two years before this court's 1984 decision in *Bigelow.* Accordingly, he cannot argue that the *Bigelow* construction existed at the time the crime at issue here was committed.

### E. *Constitutionality of Death Penalty Statute*

Defendant challenges the constitutionality of the death penalty law on the ground it has so many special circumstances that it does not perform the constitutionally required function of narrowing sufficiently to distinguish cases in which the death penalty is properly imposed from those in which it is not. We have repeatedly rejected this challenge. (E.g., *People v. Lewis* (2001) 25 Cal.4th 610, 676 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Mendoza, supra,* 24 Cal.4th at pp. 191–192.)

## V. PENALTY PHASE

### A. *Rebuttal Evidence*

After defendant introduced mitigating evidence of his good conduct in jail, the prosecution called as a rebuttal witness a jailhouse informant, Clinton Williams, who testified about defendant's plan to escape from jail. Williams further testified, over defense objection, that defendant admitted killing someone whose body was then buried in an orchard in another state. Defendant contends the trial court should not have admitted the latter testimony.

Evidence offered by the prosecution in rebuttal " 'is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 859 [277 Cal.Rptr. 122, 802 P.2d 906].) The testimony concerning defendant's escape plan was proper because it countered defendant's new evidence of his good conduct in jail. But Williams's testimony that defendant admitted killing Nancy and burying her body was improper rebuttal. It did not counter new evidence introduced by defendant; nor did defendant's penalty phase case set forth assertions not implicit in the denial of guilt.

The error, however, was not prejudicial. Williams testified in rebuttal at the penalty phase, not the guilt phase, of the trial. By that time, the jury had already convicted defendant of Nancy's murder and found the truth of the financial-gain special circumstance. Williams's testimony was also cumulative of the testimony of Richard Elander and of Jeanne Meskell that defendant told them he had killed Nancy and disposed of her body. Thus, it is not reasonably likely that the jury would have reached a penalty phase verdict more favorable to defendant without Williams's testimony. (*People v. Daniels, supra,* 52 Cal.3d at p. 860.)

## B. *Claims of Prosecutorial Misconduct*

Defendant cites four instances of alleged misconduct by the prosecutor during his penalty phase closing argument. By not objecting, defendant did not preserve these claims for appeal. (*People v. Morales* (2001) 25 Cal.4th 34, 43–44 [104 Cal.Rptr.2d 582, 18 P.3d 11].) Had the claims been preserved, as we shall explain, they would lack merit.

This court recently set forth the constitutional standards governing prosecutorial misconduct. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales, supra,* 25 Cal.4th at p. 44.) Here, defendant has not made such a showing. Nor has defendant shown "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid.*)

### 1. *Weighing process*

During closing argument, the prosecutor reminded the jury that defendant killed Nancy for financial gain. He then stated: "And I would ask every one of you to think . . . if any one of you deliberately took a human life for a few thousand dollars . . . would you expect that a jury of your peers would impose the lesser of two sentences here? Just in your own experience, is that what you would expect? *Do you think the good in your own lives would morally outweigh that type of crime?* That's one of the factors that can be considered." (Italics added.)

Defendant contends this argument was grossly misleading and a misstatement of the law. He asserts that the italicized statement diverted the jury's attention away from the background and character of the defendant to the jurors' background and character. We find no misconduct.

The prosecutor's statement was coupled with the remark that the moral weight of taking a life for financial gain is one factor for the jury to consider. That was an appropriate consideration, because it is a circumstance of the capital crime. (§ 190.3, factor (a).) Nor did the statement prevent the jury from making an individualized sentencing determination. The determination of the personal culpability of a defendant cannot be made in a vacuum divorced from social standards or the experiences and morality of others; it is to reflect a reasoned moral response to the defendant's background, character

and crime. (*Penry v. Lynaugh* (1989) 492 U.S. 302, 319 [106 L.Ed.2d 256, 278, 109 S.Ct. 2934].) In addition, the argument of defense counsel and the trial court's instructions to the jury directed the jury to consider the aggravating as well as the mitigating circumstances in relation to defendant's culpability.

### 2. *Victim impact evidence*

During closing argument, the prosecutor referred to Nancy's family's desire to find her body and give her a decent burial because "it's a way of moving on for people." The prosecutor also referred to the testimony of Nancy's daughter describing her close relationship with her mother and the traumatic effect of losing her mother. Defendant characterizes these comments by the prosecutor as misconduct. We disagree.

In *People v. Fierro* (1991) 1 Cal.4th 173, 236 [3 Cal.Rptr.2d 426, 821 P.2d 1302], this court held that a "positive reference to the status of the victim and the effect of his loss on friends, loved ones and the community as a whole" is admissible "under *Payne v. Tennessee* [(1991)] 501 U.S. [808] [115 L.Ed.2d 720, 111 S.Ct. 2597], and section 190.3, factor (a)."

The prosecutor's comments here were well within the legally permissible bounds of argument, because they described the effect Nancy's death had on her father and her daughter.

We also reject defendant's contention that allowing the prosecutor's remarks here renders section 190.3, factor (a) unconstitutionally vague. That factor permits the introduction into evidence of the "circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." Defendant concedes that the United States Supreme Court rejected a vagueness challenge to factor (a) in *Tuilaepa v. California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630], because the phrase "circumstances of the crime" has a "common-sense core of meaning." (*Id.* at p. 975 [129 L.Ed.2d at p. 761].)

We also disagree with defendant that the prosecutor's remarks here were unduly prejudicial. (*People v. Edwards* (1991) 54 Cal.3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The remarks were brief and accurate statements of testimony admitted at the guilt phase.

### 3. *Lack of remorse and future dangerousness*

In his closing argument, the prosecutor said: "The callousness and lack of remorse during the commission of this offense that the defendant exhibited is

an aggravating factor. It goes beyond just the essential constituents of a first degree murder. The callousness, the cruelty." To illustrate defendant's callousness, the prosecutor mentioned that defendant was present when Nancy said goodbye to her family, knowing he intended to kill Nancy; and that he gave Nancy's personal property to his girlfriend Lisa within hours of Nancy's death. The prosecutor continued: "That callousness, the lack of remorse that he exhibited at that time goes beyond the norm."

Defendant contends the prosecutor's comments were misconduct because they improperly treated lack of remorse as an aggravating factor. We disagree. ■ The prosecutor's comments focused on the callousness of defendant's acts and lack of remorse near the time of the murder. Such lack of remorse is a circumstance of the murder that may be argued as an aggravating factor. (*People v. Ochoa* (2001) 26 Cal.4th 398, 449 [110 Cal.Rptr.2d 324, 28 P.3d 78].) The rule on which defendant relies, that a prosecutor cannot argue remorse as an aggravating factor but as relevant to countering a claim of remorse as a mitigating factor (see *People v. Mendoza, supra,* 24 Cal.4th at p. 187), applies when the absence of remorse is argued other than in the context of the murder.

Defendant further asserts that in closing argument the prosecutor improperly argued as an aggravating factor that defendant had a propensity for future dangerousness. After saying that defendant used his intelligence and charisma to manipulate others, the prosecutor briefly discussed defendant's manipulation of various people who played a role in this case, including Richard Elander, Bergin Mosteller, and Bruce Gant; the prosecutor also mentioned the testimony of the jailers who described defendant as a good prisoner. The prosecutor then pointed out to the jury: "This is not aggravating evidence. It's only evidence in rebuttal of what they presented of his good character." Thus, contrary to defendant's assertion, the prosecutor did not argue future dangerousness as an aggravating factor.

4. *Claim that mitigating evidence was argued to be aggravating evidence*

Defendant contends the prosecutor committed misconduct by arguing that evidence introduced in mitigation should be considered aggravating. Defendant's assertion that the prosecutor improperly argued future dangerousness we rejected above. We also reject his claim that the prosecutor improperly argued that the evidence of defendant's being caring demonstrated that he was manipulative, and that the evidence of defendant's promise as a youth showed that defendant had no excuse for the murder. This is what the record shows: ■ The prosecutor argued to the jury that the mitigating evidence presented by the defendant was not in fact mitigating, and he simply

placed such evidence in the broader factual context of the case. Such argument is allowed. (*People v. Sims* (1993) 5 Cal.4th 405, 464 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

## C. *Constitutionality of CALJIC No. 8.88*

The trial court gave the jury a modified version of CALJIC No. 8.88. The instruction told the jury that in deciding between the death penalty and life in prison without the possibility of parole it should take into account and be guided by the aggravating and mitigating circumstances. The instruction ends with this statement: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Defendant challenges the instruction on four grounds, each of which he concedes this court has previously rejected. The claim that the words "so substantial" renders the instruction vague was rejected in *People v. McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146]. In *People v. Breaux* (1991) 1 Cal.4th 281, 316 [3 Cal.Rptr.2d 81, 821 P.2d 585], we rejected a claim that the term "warrants" is too overbroad and permissive. In *People v. Mickey* (1991) 54 Cal.3d 612, 701–702 [286 Cal.Rptr. 801, 818 P.2d 84], we rejected the argument that the instruction should state that the prosecution has the burden of persuasion beyond a reasonable doubt. And in *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931], we rejected the claim that before returning a verdict of death the jury must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

## VI. AUTOMATIC MOTION TO MODIFY

Judge John Schatz, Jr., presided over defendant's trial. After the jury returned a verdict of death, the judge granted the automatic motion to modify that verdict, and he reduced the penalty to life without possibility of parole. (§ 190.4, subd. (e).) The prosecution appealed. The Court of Appeal reversed, and remanded the case to the trial court for the limited purpose of redetermining the motion. (*People v. Crew* (1991) 1 Cal.App.4th 1591, 1609 [2 Cal.Rptr.2d 755].) Because Judge Schatz was unavailable, the matter was assigned to Judge Robert P. Ahern. (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892] [different judge may decide automatic motion after appeal if trial judge is unavailable].)

After twice reviewing the transcripts of the trial, reading the Court of Appeal decision, and hearing argument of counsel for both parties, Judge

Ahern denied the automatic motion to modify the penalty verdict. His findings as to each of the aggravating and mitigating factors led him to conclude that the weight of the evidence supported the jury's finding that the aggravating circumstances outweighed the mitigating circumstances, and that the verdict was not contrary to the law or the evidence.

Defendant faults Judge Ahern's ruling for not taking into consideration Judge Schatz's previous findings in the prior ruling on the automatic motion to modify. We find no error. The Court of Appeal remanded the case to the trial court for the limited purpose of redetermining of the motion. Section 190.4, subdivision (e) requires the judge ruling on the motion to review the evidence and to take into account and be guided by the statutory aggravating and mitigating evidence. Judge Ahern did so.

Defendant next asserts that in reading the Court of Appeal decision before ruling on the motion, Judge Ahern got guidance from that decision, which defendant maintains improperly reviewed de novo the aggravating and mitigating factors and described Nancy as having been executed in a callous and gruesome manner. We reject the contention. When an appellate court remands a matter to the trial court for redetermination of a matter, the trial judge should read the appellate decision to determine the reviewing court's reasons and holding. In addition, Judge Ahern here stated that he reviewed the evidence presented to the jury and did not consider any evidentiary matter that was not before the jury.

We also reject defendant's contention that Judge Ahern erred when, in denying the modification motion, he said that "the aggravating circumstances . . . outweigh the mitigating circumstances," instead of saying that the evidence in aggravation was "so substantial" in comparison to the mitigating evidence that death was the appropriate penalty. Judge Ahern used the language of section 190.4, subdivision (e), which says that the trial court should determine whether the jury properly found that "the aggravating circumstances outweigh the mitigating circumstances." "As a general rule, we presume that the trial court has properly followed established law." (*People v. Diaz, supra*, 3 Cal.4th 495, 567 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Here we find no indication that the trial court did not understand or properly apply the controlling legal principles in ruling on the motion.

## VII. CONSTITUTIONALITY OF DEATH PENALTY STATUTE

Defendant challenges various aspects of California's death penalty law as violating the federal Constitution. We have previously rejected these challenges and do so here again. A summary of the pertinent holdings follows.

The federal Constitution does not require that sentencing factors be identified as aggravating or mitigating. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1229 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) The prosecution need not prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors, and the jury need not find beyond a reasonable doubt that death is the appropriate punishment. (*People v. Bolden, supra,* 29 Cal.4th at p. 566.) Not requiring jury unanimity on an aggravating factor does not render our capital sentencing scheme unconstitutional (*People v. Bolin* (1998) 18 Cal.4th 297, 335–336 [75 Cal.Rptr.2d 412, 956 P.2d 374]); similarly, the jury need not make findings on aggravating factors (*People v. Bolden, supra,* at p. 566). Nor do our jury instructions require jury unanimity on mitigating factors or mislead a jury into believing that such unanimity is required. (*People v. Breaux, supra,* 1 Cal.4th at pp. 314–315.) The language in section 190.3, factor (d) referring to "extreme" mental or emotional disturbance, in factor (f) about reasonable belief in justification or extenuation, in factor (g) concerning substantial domination by another, and in factor (h) regarding impaired capacity does not preclude full consideration of mitigating evidence. (See *People v. Turner* (1994) 8 Cal.4th 137, 208–209 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Wright* (1990) 52 Cal.3d 367, 443–444 [276 Cal.Rptr. 731, 802 P.2d 221].) The provisions of factor (k) allowing the jury to consider any "other circumstance which extenuates the gravity of the crime" allow the jury to fully consider all mitigating evidence. (*People v. Jones* (1997) 15 Cal.4th 119, 190 [61 Cal.Rptr.2d 386, 931 P.2d 960].) The law is not unconstitutional because it fails to sufficiently narrow the class of defendants eligible for the death penalty (*People v. Bolden, supra,* at p. 566), because of prosecutorial discretion (*People v. Crittenden, supra,* 9 Cal.4th at p. 152), or because intercase proportionality review is not required (*People v. Bolden, supra,* at p. 566). Finally, the United States Supreme Court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] does not undermine the constitutionality of our capital sentencing scheme. (*People v. Ochoa, supra,* 26 Cal.4th at pp. 453–454.)

## VIII.   CUMULATIVE ERROR

Defendant contends the cumulative effect of errors committed at his trial compels reversal. The few errors that occurred in defendant's trial, considered individually or collectively, were not prejudicial.

## CONCLUSION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

**MORENO, J.,** Concurring.—I concur with the majority under the compulsion of *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], but write separately to urge this court to reconsider its holding in *Howard* that the limiting construction placed on the financial-gain special circumstance in *People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994], applies only when necessary to avoid overlap of multiple special-circumstance allegations. The meaning of the financial-gain special circumstance should not vary depending upon the number of special circumstances alleged. In the present case, where only one special circumstance is charged, the financial-gain special circumstance has the strong potential to be applied too broadly and may offer an easy opportunity for overcharging by the prosecution. The Eighth Amendment of the United States Constitution requires that a special circumstance "must genuinely narrow the class of persons eligible for the death penalty, and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 249–250, 103 S.Ct. 2733], fn. omitted.) I am concerned that the financial-gain special circumstance as interpreted in *Howard* and applied here does not meet this standard.

At the time of its inception in 1977, the financial-gain special circumstance applied only to contract killings. (*People v. Bigelow, supra,* 37 Cal.3d at p. 751.) The statute required that "[t]he murder was intentional and was carried out pursuant to an agreement by the person who committed the murder to accept valuable consideration for the act of murder from any person other than the victim." (Pen. Code, former § 190.2, subd. (a), as added by Stats. 1977, ch. 316, § 9, p. 1257.)[1] The current version of the statute, enacted in 1978 by initiative, eliminated this "accept[ance] [of] valuable consideration" language. (*Ibid.*) It currently requires that "[the] murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) In response to the change in language, we increasingly have interpreted the provision broadly even though there is "little to guide us in the construction of the financial gain special circumstance. No legislative history illumines the adoption of this special circumstance." (*People v. Bigelow, supra,* 37 Cal.3d at p. 751.)

As the majority correctly notes, we have developed two interpretations of the financial-gain special circumstance. In 1984, we adopted a narrow construction of the financial-gain special circumstance in a case in which multiple special circumstances were alleged, "to minimize those cases in which multiple special circumstances will apply to the same conduct." (*People v. Bigelow, supra,* 37 Cal.3d at p. 751.)

---

[1] Unless otherwise noted, all citations are to the Penal Code.

Four years later in *Howard*, we interpreted the financial-gain ·special circumstance more broadly to require only that the "purpose" of the murder have been for financial gain. (*People v. Howard, supra*, 44 Cal.3d at p. 410, fn. 10.) This standard expanded *Bigelow*'s formulation of the financial-gain special circumstance to "cover a broad range of situations" when only one special circumstance is charged and overlap of multiple special circumstances is not a concern. (*People v. Howard, supra*, 44 Cal.3d at p. 410.) Justice Broussard, who authored the majority opinion in *Bigelow*, dissented from this broader interpretation because "it gives a dual meaning to the phrase 'for financial gain.' " (*Id.* at p. 447 (conc. & dis. opn. of Broussard, J.).) Justice Broussard's concern, which I share, is that this second interpretation allows the financial-gain special circumstance to be interpreted too broadly where one special circumstance is charged.

As the majority states, subsequent to *Howard* we continued to refine the financial-gain special-circumstance standard. (Maj. opn., *ante*, at p. 850.) In *People v. Noguera* (1992) 4 Cal.4th 599, 636 [15 Cal.Rptr.2d 400, 842 P.2d 1160], and in *People v. Jackson* (1996) 13 Cal.4th 1164, 1229 [56 Cal.Rptr.2d 49, 920 P.2d 1254], we clarified that the murder need not be committed exclusively, or even primarily, for financial gain. Taken together, these cases have opened the door for the financial-gain special circumstance to be applied where the defendant gains financially in any respect from the murder, even if financial gain is not a motive for the killing.

In the instant case, the prosecution did not offer direct evidence that defendant killed the victim for the purpose of financial gain. Instead, the facts indicate defendant first spoke of killing the victim in May 1982, before the couple was married or the victim had decided to move with him to South Carolina. Together these facts show defendant thought of killing Nancy at least two months before she closed her accounts and withdrew a large amount of cash. Although defendant liquidated the victim's assets after her death, it is debatable that these facts are sufficient from which to conclude that the· murder was carried out for financial gain.

Today, the majority expands the application of the financial-gain special circumstance to include a new category of cases beyond the murder-for-hire or gain-from-insurance-proceeds schemes in *People v. Howard, supra*, 44 Cal.3d 375, *People v. Noguera, supra*, 4 Cal.4th 599, and *People v. Jackson, supra*, 13 Cal.4th 1164. The effect of this expansion is that it allows prosecutors to allege the financial-gain special circumstance in theft cases in which the evidence falls short of meeting the standard for the robbery special circumstance, resulting in an overlap among the special circumstances. Such an interpretation fails to narrowly define a set of cases to differentiate the special situation in which death is warranted. (*Zant v. Stephens, supra*, 462

U.S. at p. 877 [77 L.Ed.2d at pp. 249–250].) Instead, as in the present case, evidence that shows defendant sold the victim's belongings after the murder is sufficient to prove that the killing was carried out for the purpose of financial gain. For these reasons, the financial-gain special circumstance, as applied today, is too broad. The narrow construction adopted in *People v. Bigelow*, *supra*, 37 Cal.3d at page 751, should remain the standard used to separate those cases that warrant a death sentence regardless of the number of special circumstances alleged.

Appellant's petition for a rehearing was denied October 29, 2003, and the opinion was modified to read as printed above.