Filed 11/21/13  P. v. Ervin CA2/6
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILL A. ERVIN,<br><br>    Defendant and Appellant. | 2d Crim. No. B242752<br>(Super. Ct. No. TA117136-01)<br>(Los Angeles County) |

Will A. Ervin appeals a judgment following his conviction of first degree murder (Pen. Code, § 187, subd. (a), 189),[1] with jury findings that he personally and intentionally discharged a firearm causing the death of James Hampton (former § 12022.53, subd. (d)), and that he committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  We conclude, among other things, that:  1) Ervin has not shown prosecutorial misconduct because of a gang expert's brief reference to an inadmissible matter while discussing gang and prison tattoos, and 2) the trial court did not abuse its discretion by denying a motion for a mistrial.  We affirm.

FACTS

Ervin and William Abner were members of the Kelly Park Crips gang. They shared the use of a burgundy SUV.

---

[1] All statutory references are to the Penal Code.

On February 7, 2009, Ervin told Abner of his confrontation with Anthony King, a member of the Atlantic Drive Crips, a "rival" gang. Ervin was angry because King pointed a gun at him. Abner went with Ervin to help him find King so that Ervin could "kick his ass." Ervin drove the SUV to the home of Abner's girlfriend. Abner went into the residence and stayed for 45 minutes.

While Abner was visiting his girlfriend, Ervin drove the SUV to the Jack Rabbit liquor store, went in the store, came out and drove the vehicle back to the residence. Abner came out and decided he wanted to drive the SUV, so Ervin moved to the passenger seat.

Abner drove the vehicle in front of the Jack Rabbit liquor store. Ervin saw that James Hampton, a member of the Atlantic Drive Crips gang, was "sitting in his car" in the parking lot. Ervin told Abner to "go around" because he wanted to "holler at him." Abner drove the car down a side street, came back and entered the Jack Rabbit liquor store parking lot. He stopped the vehicle.

Ervin got out, opened the back door and pulled out an AK-47 assault rifle. He ran over to Hampton, who was unarmed, and fired six shots at him. Hampton died as a result of "multiple gunshot wounds." Ballistics evidence showed that bullet fragments found at the crime scene were fired from an assault rifle, such as an AK-47.

Abner testified that he did not shoot Hampton and did not get out of the vehicle when Ervin fired his weapon. After the shooting, Ervin went to Arizona. Abner was subsequently arrested. He pled guilty to voluntary manslaughter and received a 13-year prison sentence. Ervin was arrested in Phoenix, Arizona, on March 10, 2011.

Luzell Caver testified that around 8:10 p.m. on February 7, 2009, he saw two "black" men get out of an SUV. They "started shooting towards the door of [the] Jack Rabbit" liquor store. The driver of the SUV had a revolver and the passenger was firing an automatic weapon. They fired 12 shots, got back in the SUV and drove away. The liquor store security camera video showed the two men that Caver saw get out of and then back into the SUV after the shooting. Caver identified the driver as Abner.

2

Deputy Sheriff Frank Montoya was near the Jack Rabbit liquor store and he heard the gunshots. He testified there were 6 to 12 shots fired by a handgun and a rifle.

Deputy Sheriff Marcelo Quintero testified that a video from the liquor store's security camera showed Ervin entering the store on February 7, 2009, and that he was driving a burgundy SUV. A "time stamped" photograph from the video shows Ervin in the store at 7:11 p.m. He then left the store and got back into the SUV. Quintero testified the video shows Hampton at the store at 8:05 p.m. It also shows the same SUV, which Ervin had driven, moving "past the front entrance of the Jack Rabbit Liquor Store." That vehicle then proceeded into the store's parking lot. The shooting took place shortly thereafter. An interior store camera shows customers diving under fixtures with startled looks on their faces.

In the defense case, Djuanisha Hawkins, Ervin's fiancé, testified that on February 7, 2009, she drove Ervin to a friend's house. She later picked him up at that house between 7:00 p.m. and 7:30 p.m. In January 2009, she had a car, and because of that, Ervin did not drive a "burgundy" SUV at that time. Hawkins testified she knew Ervin had been arrested for murder in March 2011. Two days after his arrest, she was interviewed by a detective who was investigating the murder of James Hampton. She did not tell the detective that she was with Ervin on the night the crime was committed. The first time she mentioned this alibi was when she was talking to a defense investigator on May 25, 2012.

*The Gang Expert's Testimony*

Richard Sanchez, the sheriff's department gang expert, testified that Ervin was a member of the Kelly Park Crips gang. The shooting of Hampton was for the benefit of that gang. It was retaliation for the actions of King, a member of the rival Atlantic Drive Crips gang. Hampton was a member of that rival gang. Shooting him sent a message to the rival gang that the Kelly Park Crips members would not tolerate disrespect from rival gang members.

3

Sanchez said Ervin had gang tattoos. One tattoo stated, "Craziest Compton Killer." The prosecutor asked Sanchez the significance of the size and location of that tattoo and whether it referred to "the individual that's wearing it."

Sanchez said: "It's a big--what we call a placard. The size of the tattoo is a pretty big tattoo. You usually will see these tattoos in prison; reason being that in prison, they like to wear no shirt, so they walk around the yard flashing whatever gang they're from. In this case, it has the word 'Compton.' *Obviously, this individual wants them to know that he is the craziest Compton killer and he walks around prancing in prison so that people can see the size of the tattoo.* Actually, I read the tattoo. If it was where people can't see it, it has really no significance if it can't be displayed. You'd just look at it as a piece of art. They put it on there so that people can see it, so that they can broadcast their message to the individual that's actually looking at it." (Italics added.)

Ervin's counsel objected and the trial court held a "sidebar discussion."

*The Motion for a Mistrial*

Ervin's counsel moved for a mistrial. She said the issue of Ervin's prior criminal record had been bifurcated. She claimed the prosecutor "asked a question which allowed" Sanchez to testify "that [her] client has been to prison which in turn indicates that he has a criminal record which is the point of [them] bifurcating and keeping that information out."

The prosecutor responded, "I don't believe that the witness testified that the defendant has been to prison. He said that if someone goes to prison, they want to display it . . . . I don't believe he said that Mr. Ervin has actually been to prison; that he has been convicted. So I don't think it is something that the jury is going to infer based upon what he testified to."

The trial court denied the mistrial motion. The trial judge said, "[Sanchez] has not testified that Mr. Ervin has been to prison . . . . As for whether the jurors would speculate or not, I don't believe that there was enough to make them speculate on that because this witness testified about tattoos and how people get different sizes and display

4

it differently." The court found no prejudice to Ervin. It said it would allow Ervin to "renew" the motion "depending on how the testimony goes."

Ervin's counsel requested the trial court to admonish the jury "that they are not to consider that testimony . . . with respect to whether or not Mr. Ervin has been to prison." The court: "I'll do that."

DISCUSSION

*Prosecutorial Misconduct*

Ervin contends the judgment must be reversed because of the prosecutor's misconduct of not instructing the gang expert not to refer to his prior conviction. He claims the trial court erred by not granting a mistrial.

The People contend Ervin forfeited this claim because his counsel withdrew the request for a jury admonition. We agree.

At the end of the defense case, Ervin's counsel made a tactical decision. She told the court, "I don't want to have the court admonish the jury with respect to Deputy Sanchez's testimony at this point. I think it would have been appropriate at the time, but to do it now will be highlighting something." Because of counsel's request, the court decided not to give the admonishment.

"[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Here the request for an admonishment was withdrawn. Ervin contends an admonition would not have cured the prejudicial impact of the prison remark.

Sanchez's remark, "*he walks around prancing in prison*," was made during a discussion about a type of gang tattoo that "you *usually will see*" in prison. (Italics added.) The uncontested gang evidence showed that Ervin wore a placard--a gang and prison tattoo. In many cases there is no difference between gang and prison tattoos. The defense did not move to exclude evidence about the prison aspect of gang tattoos; consequently, it came into evidence without objection. Ervin only objects to one sentence in the discussion of this subject matter--a small portion of Sanchez's testimony.

5

Sanchez did not directly testify that he knew Ervin had been in prison and the prosecutor did not introduce evidence of a prior conviction. The trial court correctly concluded that: 1) jurors would either interpret Sanchez's remark as a hypothetical example of how a gang member would use this tattoo in prison, or 2) if not, a proper instruction to jurors would suffice.

If jurors interpreted the prison remark to refer to Ervin, an admonition would have cured any prejudice. It is only in "exceptional cases" where "the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions." (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.)

In *People v. Valdez* (2004) 32 Cal.4th 73, 123, the defendant claimed a prosecutor committed misconduct by eliciting testimony designed to reveal the defendant's prior conviction. A detective made a reference in his testimony which suggested the defendant had been in jail. The court held the claim of prosecutorial misconduct was forfeited because "an admonition would have cured any prejudice." (*Ibid.*) It said the detective's "fleeting reference to 'jail' was not 'so outrageous or inherently prejudicial that an admonition could not have cured it.'" (*Ibid.*)

In *People v. Avila* (2006) 38 Cal.4th 491, 571-574, a witness testified the defendant had been in prison. The Supreme Court upheld the trial court's denial of the defendant's mistrial motion. The trial judge correctly determined that an admonition to the jury was sufficient to cure any prejudice from the prison remark. In *People v. Lewis* (2008) 43 Cal.4th 415, 501, a police officer testified, "We had information that they were ex-cons." (Italics omitted.) The court held this testimony "did not result in prejudice that was incurable by admonition." (*Ibid.*) In *People v. Bolden* (2002) 29 Cal.4th 515, 554, a police officer testified the defendant's address was "the Department of Corrections parole office." The court held the trial court properly denied a mistrial motion. (*Id.* at p. 555.) The remark did not irreparably damage the defendant's chance to receive a fair trial.

Here, as in *Avila*, *Bolden*, *Lewis*, and *Valdez*, an admonition regarding Sanchez's brief remarks could have cured any prejudice. Declining the court's offer to give an admonition constitutes a forfeiture of this claim. (*People v. Valdez*, *supra*, 32

6

Cal.4th at p. 124.)  But it appears counsel had a sound tactical reason not to request an admonition that could draw the jury's attention to this passing remark.

"To constitute a violation under the federal Constitution, prosecutorial misconduct must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" (*People v. Valdez, supra*, 32 Cal.4th at p. 122.)  "'But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" (*Ibid.*)

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew, supra*, 31 Cal.4th at p. 839.)  "If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People v. Warren* (1988) 45 Cal.3d 471, 482.)  "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Crew*, at p. 839.)

Ervin has not shown that the prosecutor engaged in misconduct.  Ervin's prior criminal record was inadmissible.  But the prosecutor did not ask Sanchez about his record or his prison terms.  There was no showing that she tried to elicit inadmissible evidence.  The questions about the tattoo were relevant on the gang issues.  Ervin has not shown why the trial court could not reasonably infer that the witness volunteered the references to prison.

Ervin claims the prosecutor engaged in misconduct by not warning Sanchez not to refer to his criminal record.  But he has not cited to evidence to support this claim. He asserts that the prosecutor did not state whether she advised the witness on this matter. He claims her silence is an admission of misconduct.  But the defense and the trial court did not ask the prosecutor to state what instructions she gave to Sanchez.  Because the record does not "show what the prosecutor said" to Sanchez "before [he] testified," there

is "no evidence that [she] violated [her] duty to guard against impermissible references during [Sanchez's] testimony." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.)

A mistrial should be granted where the court finds the prejudice is "incurable by admonition or instruction." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) But "'"[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*Ibid.*)

Ervin has not shown an abuse of discretion. The trial court evaluated the prejudicial impact of the statement. It denied the motion because it was premature to conclude the remarks would ultimately have a prejudicial impact. It proceeded cautiously by allowing the defense to renew the motion based on the developing evidence at trial. It also agreed to provide an admonition.

The prejudicial impact of a witness's reference to inadmissible evidence against the defendant may be dispelled by: 1) the witness's subsequent testimony on cross-examination which negates or reduces the prejudicial impact, 2) the use of that evidence by the defense as part of trial strategy, or 3) the dilution of the prejudicial impact by the weight of all the trial evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 565; see also *People v. Collins* (2010) 49 Cal.4th 175, 199; *People v. Bolden*, *supra*, 29 Cal.4th at p. 555.) Ervin's counsel withdrew the request for an admonition at the end of the defense case. Sanchez's subsequent testimony had dispelled the prejudicial impact of his prior remarks. On cross-examination, he admitted he did not know why Ervin had selected his tattoos. Jurors could view this as a retraction of his prison remark or as an admission that it did not apply to Ervin.

Ervin's counsel elected to use the prison reference to impeach Sanchez in lieu of an admonition. She told the jury some of Sanchez's testimony was contradicted by his prior statements. She added, "[I]f he's going to lie to you about that, then you have to think about what else he's going to do. *Is he going to get up there and start talking about how my client's tattoos make him look like he went to prison when you have no evidence of that* so that you could think that Mr. Ervin has been to prison, that he is a bad

8

guy because he has these tattoos.  What else is he going to do?"  (Italics added.)  She argued Sanchez was not credible because he made assertions about the tattoos without knowing why Ervin selected them.

Ervin claims Sanchez's reference to prison is so prejudicial that it constitutes reversible error and he claims the result would have been more favorable without that remark.  But for a remark to trigger a mistrial, it must be "significant in the context of the entire guilt trial" and irreparably damage the chance for a fair trial.  (*People v. Bolden*, *supra*, 29 Cal.4th at p. 555.)  In a number of cases, courts have held a witness's volunteered brief remark indicating the defendant had been in jail or prison was not so prejudicial as to require a new trial.  (*Id.* at pp. 554-555; *People v. Avila*, *supra*, 38 Cal.4th at pp. 571-574; *People v. Valdez*, *supra*, 32 Cal.4th at p. 123.)

The People contend the remark was not prejudicial when contrasted to the uncontested gang testimony.  We agree.  Ervin admitted to police that he was a member of the Kelly Park Crips.  It was undisputed that this is a violent street gang.  Sanchez testified that the "Craziest Compton Killer" tattoo is "a gang tattoo."  The defense did not object when Sanchez testified about its meaning.  Sanchez said it meant Ervin "is claiming *that he's a killer*."  (Italics added.)  Nor did Ervin object when Sanchez testified this is the type of tattoo "usually" seen in prison.  This uncontested evidence, the prosecution's evidence about his gang lifestyle, and the violent nature of his crime undermine Ervin's claim that Sanchez's prison remark was the event that irreparably turned jurors against him.  Courts have affirmed denials of mistrial motions where the facts the jurors heard were far more prejudicial than Sanchez's remark.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 683 ["We find no basis for concluding, on the present record, that the knowledge that defendant previously had been convicted of murder and sentenced to death was incurably prejudicial"].)

Ervin contends Abner's testimony about his non-participation in the shooting was contradicted by Caver and Montoya.  But the jury found Abner credible regarding his testimony about Ervin shooting Hampton.  The ballistics evidence

9

supported the prosecution's case. It was also bolstered by security camera evidence. Ervin has not raised a substantial evidence claim.

Ervin contends he presented "credible alibi" evidence. But Hawkins's alibi testimony was impeached by a security camera video. It showed Ervin entering the liquor store at the time she claimed he was at a friend's house. Hawkins testified Ervin did not drive an SUV. But the security video showed him getting in and out of the SUV.

In addition, police questioned Hawkins about the crime two days after Ervin's arrest. But she did not tell the detective that she was with him on the night of the shooting. The prosecutor emphasized her strange behavior as a fiancé not telling police about this alibi to help her future husband who was charged with a crime she claims he did not commit. Jurors did not find Hawkins to be credible and they could reasonably infer Ervin's defense case was entirely based on a false alibi. Ervin has not shown "it is reasonably probable that a result more favorable to [him] would have been reached without the [alleged] misconduct." (*People v. Crew*, *supra*, 31 Cal.4th at p. 839.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:



YEGAN, J.



PERREN, J.


10

Tammy Chung Ryu, Judge

Superior Court County of Los Angeles

_____


John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.