Filed 5/10/24  P. v. Ward CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KAIREE KIEON WARD,<br><br>        Defendant and Appellant. | A165864<br><br><br>(Alameda County<br>Super. Ct. No. 20CR013946A) |

Defendant was convicted by a jury of three counts of second degree robbery (Pen. Code, § 211; first, second and fourth counts)[1] and one count of misdemeanor carrying a concealed firearm within a vehicle (§ 25400, subd. (a)(1); seventh count).  As to the three robbery counts, the jury found true allegations that defendant was armed with a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)).  Defendant was sentenced to a total term of seven years.  On appeal, defendant argues that (1) the trial court erred in admitting a video recording of one of the victims identifying defendant in a photograph lineup as a prior inconsistent statement, (2) the prosecutor committed misconduct by violating the trial court's order barring evidence of gang activity, and (3) the trial court erred by admitting custodial statements by

---

[1] All statutory references are to the Penal Code unless otherwise stated.

codefendant Joshua West.  Although not raised by defendant, the People request that we strike the concurrent 16-month terms imposed based on the jury's true findings on the firearm enhancements on the second and fourth counts.  As the People explain, the firearm enhancements on the second and fourth counts were alleged only against West and not against defendant.  We modify the judgment as requested by the People and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Trial Evidence*

Defendant and codefendant West were tried together before a jury.

### A.  K.J.'s Testimony

The week before trial, K.J. failed to appear in response to the prosecutor's subpoena.  The next day, he appeared before the trial judge with his mother.  His mother expressed concerns about retaliation.  The trial court ordered K.J. to appear for trial; otherwise, a warrant would be issued.  K.J. testified reluctantly.  At the time of trial, he was 19 years old.  However, on October 11, 2020, the day of the robbery, K.J. was a 17-year-old high school student.  He testified that he did not remember being robbed and denied contacting the police.  K.J. stated he had never reported a crime.  The prosecutor played a recording of a 911 call in which the victim states he was robbed when a young Black man got out of a silver BMW SUV and displayed a gun "like an AR-15."[2]  The victim further stated in the 911 call that another young Black man exited the car and stole his chain, money, and phone.  After hearing a portion of the 911 recording, K.J. admitted the voice on the call "may" have been him, but he was unsure if he said the specific words.

---

[2] The audio recording of the 911 call does not state the time of the call; however, the victim said the robbery occurred 10 or 15 minutes prior to the call.  The prosecutor argued in opening and closing that the Oakland robbery occurred around 12:35 p.m.  The timing of the robbery is not disputed.

K.J. also stated he did not recall speaking to police officers who responded to the scene or telling them that three people approached him in a BMW; one person took his phone, $5 in cash, and his "Buddha" pendant; or that he recognized the individuals from social media. When shown a video recording of the police officers' body camera footage, K.J. admitted the person in the video looked like him. He testified that he did not recall showing the police officers screenshots of defendant.

K.J. also did not recall police officers' showing him a photograph lineup in which he identified three suspects.[3] He did not recognize his signature on the photographs. Over the defendants' objections, the prosecutor played a video recording of K.J.'s being administered the photograph lineup. K.J. stated that the person in the video "may be me and it sounds like me, but I'm not sure if it is." In the video, the victim identified defendant's photograph from the photograph lineup as "the one with the gun" and stated he knew defendant's face from music videos and had seen him in the streets before.

**B.    Testimony of Walnut Creek Robbery Victims**

Bettie K. was 82 years old on October 11, 2020. Around 2 p.m. that day, she was walking from a grocery store to her home in Walnut Creek with her daughter (Karen F.) and her teenage grandson. A young man about 5'7" tall suddenly got in front of her and shouted at her to give him her purse. When Bettie K. initially refused, the man grabbed her purse and hit her in the face with the butt of a long gun. She described the man as a thin, young "Black man." A second young "Black . . . man," who was taller, took her daughter's purse. Bettie K. gave the first man her purse. Both men ran to a "light-colored car" and drove away. Bettie K. was unable to identify the men

---

[3] A third suspect was not charged.

who robbed her when the police later showed her photographs of possible suspects, and she could not identify the defendant in court.

Karen F. testified that on October 11, 2020, while she was walking back from a grocery store in Walnut Creek with her mother and son, she heard and saw a BMW SUV pull up on the opposite side of the road. Two "African-American" men in their early 20's wearing hoodies approached her and her mother. The man in front of her mother was about 5'7" and wore a dark hoodie and had a long gun. He pointed the gun at her mother and demanded her purse. When her mother said no, the man hit her mother with the butt of the gun. Karen F. told her mother to give the man her purse, and she did. The other man then asked for Karen F.'s purse, and she gave it to him. The man who took Karen F.'s purse was at least 5'9" or "maybe taller" and was wearing a yellow hoodie. Karen F. was unable to identify either defendant at trial.

### C.    Law Enforcement Testimony

Officer Luu of the Oakland Police Department was patrolling the High Street and MacArthur Boulevard area of East Oakland on October 11, 2020. He met with K.J. after the robbery occurred, at Maybelle and Masterson. Officer Luu's partner, Officer Frias, was with him when they met with K.J. Both officers were wearing body cameras. The prosecutor played a video recording of the body camera footage, and Officer Luu identified himself speaking with K.J. K.J. tentatively identified three people involved in the robbery by showing Officer Luu music videos. One of the three people K.J. identified in one of the music videos was the man who had the AR-15. K.J. also said he recognized the men who robbed him from "the area 45 and Fairfax." (*Sic.*)

4

Officer Cardana of the Oakland Police Department testified regarding the three photograph lineups he conducted with K.J. on October 14, 2020. The photograph lineups were "double-blind," meaning that Officer Cardana had no knowledge or information about the case. Officer Rosin, who was the lead investigator in the case, created the three photograph lineups for Officer Cardana to administer. The prosecutor played a portion of the video recording of the photograph lineups, and Officer Cardana confirmed the video accurately depicted him administering the photograph lineups to K.J. Officer Cardana also identified the three separate sets of photograph lineups he administered to K.J. and the photograph lineup "waiver advisement" signed by K.J. K.J. identified an individual in each of the three sets of photograph lineups and signed his initials.

Oakland Police Officer Rosin, the investigator who created the photograph lineups, testified that in the first set of photographs, defendant was in photograph number 3. K.J. selected defendant's photograph. Officer Rosin was familiar with defendant. Officer Rosin reviewed surveillance video from near the scene of the robbery. In video timestamped 12:32 p.m., Officer Rosin identified codefendant West's car and K.J. in the area. The robbery was not captured on the surveillance.

Oakland Police Officer Loya testified that on October 11, 2020, he was working in the department's "Ceasefire section" and focused on violent crimes. Officer Loya was familiar with defendant from electronic and in-person surveillance he had been conducting for several months. Officer Loya had surveilled defendant over a dozen times and identified him in court. On October 11, 2020, about 2 p.m., Officer Loya viewed a video from defendant's social media account, which had been posted about 10:00 a.m. that morning. In the video, defendant was wearing a "black do rag, white

5

T-shirt . . . , camo hoody." (*Sic.*) The hoodie was a "[v]ery distinct yellow and green."

About 2:30 p.m. on October 11, 2020, Walnut Creek Police Officer Spoto was dispatched to the area of the westbound on-ramp to Highway 24 in Walnut Creek. She located two purses, a wallet, and a pair of glasses, which she photographed and provided to the investigating officer. A license plate reader showed that West's car was in the area of the Walnut Creek Highway 24 on-ramp at 2:10 p.m. on October 11, 2020.

Oakland Police Officer Urquiza worked in the special investigations unit, which was part of the "Ceasefire program." As part of this unit, Officer Urquiza investigated violent crime. About 12:45 p.m. on October 11, 2020, Officer Urquiza was observing a live feed of surveillance footage from the 4700 block of Fairfax Avenue. At 12:45 p.m., codefendant West's silver BMW X3 pulls up on the side of the street. Officer Urquiza was familiar with codefendant West and his car from surveillance over several months. He was also familiar with defendant from prior surveillance. He identified both defendants in court. In the surveillance video from 12:45 p.m. on October 11, Officer Urquiza identified codefendant West exiting his car and defendant exiting the front passenger seat.[4] Defendant was wearing a "camo hoody [*sic*]." Officer Urquiza believed defendant was approximately 6'3" or 6'4" and that codefendant West was significantly shorter. There was a third person in the car whom Officer Urquiza did not identify at the time. Defendant and codefendant West returned to West's car, with West in the driver seat and defendant in the front passenger seat. The car left at 1:24 p.m.

---

[4] Officer Urquiza explained he was able to identify the defendants' faces by zooming in the surveillance footage.

Officer Urquiza identified codefendant West's car in a second video taken from a location two blocks away. About 3 p.m. on October 11, West's car pulled up to the curb. Defendant exited the front passenger seat wearing the same clothing as earlier.

Officer Urquiza was also shown surveillance video from the Walnut Creek robbery. He recognized that the two men were wearing the same clothing he observed defendants wearing in the earlier videos. The man with the "distinctive camouflage hoody [*sic*]" appeared to be the same height as defendant.

On October 12, 2020, codefendant West's car was involved in a traffic collision. The police searched the car. An "extended magazine" for a firearm was found under the driver's seat, and spent casings were found in the trunk. A gold chain with a jade Buddha pendant was in the rear passenger seat.

On October 20, 2020, California Highway Patrol Officer Brown pulled over a Toyota Avalon in San Lorenzo. Defendant was a passenger in the car. A loaded AR-15 pistol, approximately 12–18 inches long, was located on the floorboard of the driver's seat.

## D. Verdict and Sentencing

After jury instructions were given but before the verdict, codefendant West entered a plea to one count of second degree robbery and admitted he was armed with an assault weapon. The jury convicted defendant on the first count (Oakland robbery), second count (Walnut Creek robbery), fourth count (Walnut Creek robbery) and seventh count (misdemeanor carrying concealed firearm in vehicle). As to the first count, the jury found true that defendant personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and found not true that he personally used an assault rifle. As to the second and fourth counts, the jury found true the personal firearm use allegations

7

(§§ 12022.5, subd. (a), 12022.53, subd. (b)) and found not true the principal armed allegation (§ 12022, subd. (a)(2)).

Defendant was sentenced to a total term of seven years, comprised of the middle term of three years on the first count (§ 211) plus four years for the personal use firearm enhancement (§ 12022.5, subd. (a)). Additionally, on the second and fourth counts, defendant was sentenced on each count to concurrent terms of one year plus 16 months for the personal use firearm enhancements. On the seventh count (§ 25400, subd. (a)(1)), he was sentenced to a one-year term, which was stayed pursuant to section 664.

## DISCUSSION

### I. *The trial court did not err in admitting K.J.'s video identification of defendant.*

Defendant contends the trial court erred by admitting K.J.'s video identification of defendants (exhibit 7) as a prior inconsistent statement. He argues that because K.J. did not deny participating in the lineup but, rather, stated he could not recall doing so, there was no inconsistency.

#### A. Additional Background

K.J. testified that he did not recall identifying defendant as the person with the AR-15 or codefendant West as the driver of the BMW. The prosecutor played the first 10 seconds of a video recording of K.J. identifying the suspects in the photograph lineups. She then asked K.J. if he recognized himself in the video. He stated, "That may have been me, but I don't recall me ever speaking with anybody, neither do I recall making any police report." Neither defendant objected up to this point. The prosecutor then distributed transcripts and indicated she was going to continue playing the video.

8

Codefendant West's counsel objected that the video was not admissible as either a prior identification[5] or an inconsistent statement, under Evidence Code sections 1235 and 770.  He argued that K.J.'s statements that he did not recall the lineup were not a denial and therefore he could not be impeached with a prior inconsistent statement.  The trial court overruled the objection and stated:  "I believe the witness was given an opportunity to discuss, to explain, to deny.  The witness has indicated that it may be him but he does not recall making a statement at any time.  I do think that he can be impeached with his inconsistencies pursuant to 770 of the Evidence Code."  "He said that may be me.  I don't remember making a statement and I never made a statement to police.  I never made a statement to police is what he said on numerous occasions."  Defense counsel, who joined in the codefendant's objection, stated:  "So if it's to impeach, we're essentially saying he's lying on the stand about his lack of memory.  Is that what counsel's implication is?"  The trial court, which previously noted that K.J. had been declared a hostile witness, responded:  "It's impeachment.  He's being impeached.  So his statement today is different from his statement before.  So the jury can make a determination in terms of that . . . I'm not going to put a label on it, but it is inconsistent."

The prosecutor then played additional portions of the video in which the witness signed paperwork identifying suspects, including defendant.

B.     **Legal Principles**

We review rulings on the admissibility of evidence for an abuse of discretion and will not reverse unless it is established that the "court

---

[5] The People argue that the evidence was properly admitted as a prior inconsistent statement under Evidence Code section 1235.  They do not argue it was admissible as a prior identification under Evidence Code section 1238.

exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Evidence Code section 1235 states: "Evidence of a statement by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

"Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event. (*People v. Sam* (1969) 71 Cal.2d 194, 208–210 [citations].) 'But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 221.) A trial witness's deliberatively evasive forgetfulness is an implied denial of prior statements, which creates "inconsistency in effect" and authorizes admission of the witness's prior statements under Evidence Code section 1235. (*People v. Green* (1971) 3 Cal.3d 981, 988–989.) A prior trial court finding of evasiveness is not a "condition precedent" for admission of a prior inconsistent statement. (*People v. Pinholster* (1992) 1 Cal.4th 865, 937, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) "As long as there is a

10

reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220.)

## C.    Analysis

Defendant correctly argues that a lack of recall is not necessarily inconsistent with a prior statement. He then asserts that a prior statement is admissible to impeach a lack of memory "if the trial court finds that the witness is being dishonest or evasive." Defendant concludes that the trial court erred in admitting the prior statement because it "declined" to find K.J. was lying or being evasive and it incorrectly stated that K.J. testified that he " 'never made a statement to police . . . .' "

Defendant's argument is without merit. First, to the extent defendant suggests that a trial court must first make a finding that a witness who asserts a lack of memory is being dishonest or evasive before admitting a prior inconsistent statement, our high court has held the opposite. (*People v. Pinholster, supra*, 1 Cal.4th at p. 937.) Defendant's cited authority, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 415, does not hold otherwise. *Bryant, Smith and Wheeler* held that substantial evidence supported the trial court's finding that the witness's "claimed failure of recollection was actually a deliberate evasion tantamount to a denial." (*Ibid.*) Because the trial court made this express finding, there was no need for the California Supreme Court to reconsider the issue of whether such a trial court finding is a "condition precedent" to admitting an inconsistent statement. (*Ibid.*) *Bryant, Smith and Wheeler* does not even cite, much less

11

overrule, *Pinholster*'s holding that it is not a "condition precedent" for the trial court to make such an express finding. (*Ibid.*)[6]

Further, the record supports the trial court's finding that K.J. made at least some statements inconsistent with his participation in the photograph lineup. It is true that in response to the prosecutor's questions regarding the robbery that occurred two years prior, K.J. repeatedly stated he could not remember or did not recall. However, he also denied calling the police and denied ever reporting a crime. Defendant argues that K.J.'s statement that he did not call the police was accurate because the call was placed by another person before K.J. was put on the line to speak with the 911 operator. Regarding K.J.'s denial that he ever reported a crime, defendant asserts that the question posed to him was whether " 'he had ever reported a crime *before*' " and that his denial in response to this question was not inconsistent with his prior statements to the police during the photograph lineups. We reject defendant's hairsplitting contentions that K.J.'s denials were not inconsistent with his cooperation with police in the photograph lineups. A fair reading of K.J.'s testimony supports the trial court's finding that he testified inconsistently with his prior statements to the police.

---

[6] Defendant also cites to *People v. Parks* (1971) 4 Cal.3d 955 in support of his position that the trial court must find a witness's lack of memory is evasive before admitting a prior inconsistent statement. Similar to *Bryant, Smith and Wheeler*, *Parks* does not address this precise issue. Rather, it found the witness's lapse of memory as to some statements contained in a police report was not inconsistent and that "[i]t was not established that she was deliberately evasive or that her asserted lapse of memory was untrue." (*Parks*, at p. 960.) To the extent defendant reads this statement as imposing a requirement that the trial court must make a specific finding of evasiveness, we think he reads it too broadly. Moreover, *Parks* was decided over 20 years before *Pinholster*, which directly addresses the issue at hand and clearly states that such a finding is not a "condition precedent." (*Pinholster*, at p. 937.)

Moreover, although the trial court did not specifically state that K.J.'s lack of memory was evasive or dishonest, we find "there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful [such that] admission of his . . . prior statements is proper." (*People v. Johnson, supra*, 3 Cal.4th at pp. 1219–1220; *People v. Pinholster, supra*, 1 Cal.4th at p. 937.) K.J., who was 19 years old at the time of trial, initially failed to appear in response to a subpoena. He then appeared before the trial court with his mother, who expressed concerns about retaliation. The trial court explained that if he did not appear at trial in response to the subpoena, a bench warrant would be issued. At trial, K.J. admitted that he was not comfortable testifying. Shortly after his testimony began, he was declared a hostile witness. When presented with audio of the 911 call, he denied it was his voice, before admitting it "may" have been his. He made similar statements when shown videos, saying it "may have been me" then adding it did not help him recall anything. He claimed he could not remember as far back as October 2020. However, K.J. remembered other events from the fairly recent past. He testified that he had attended high school and graduated in 2021. When K.J. was asked if he lived in Oakland on October 11, 2020, he said, "I don't recall. Not sure." He then admitted he was born in Oakland and currently lived in Oakland. When he was asked again if he was living in Oakland a couple of years prior, he testified, "Like I said, I can't recall. [T]hat was two, three years ago. You just named a date. I don't recall," before finally admitting that he had never lived anywhere other than Oakland. On this record, even if K.J.'s testimony did not expressly contradict his prior statements, the record supports a finding that his testimony was evasive and untruthful, and therefore "inconsisten[t] in effect," such that the trial court's admission of K.J.'s prior statements in the

13

video recording of the photo lineups was proper. (*People v. Pinholster, supra*, 1 Cal.4th at p. 937; *People v. Green, supra*, 3 Cal.3d at p. 989.)

## II. *Prosecutorial Error*

Defendant contends the prosecutor violated a pretrial court order that police officers " 'not mention[] anything about being on the gang team or monitoring potential gang activity.' " He asserts the order was violated when (1) Officer Loya testified he was assigned to the " 'Ceasefire Section,' " which was " 'the gang unit for the departments' "; (2) Officer Urquiza testified that he identified codefendant West from a " 'live feed' " area he surveilled because it " 'was associated to a group that had been involved in additional violent crime as well as firearms possession' " and that he knew West because a month earlier he executed a search warrant and took West into custody regarding a firearm; and (3) the prosecutor played a video of Officer Rosin's interview of West, in which Officer Rosin noted West had " 'some gang ties.' "

### A. Additional Background

The prosecution called Officer Loya, who testified that he had worked for the Oakland Police Department for over seven years. The prosecutor then asked him what he was doing for the department on October 11, 2020. Officer Loya responded that he was working for the Ceasefire section. When asked, "And what is Ceasefire?" Officer Loya stated, "Ceasefire, we do quite a bit of things, but, similar, like, the gang unit for the departments." When asked why he was communicating with Officer Urquiza, Officer Loya said, "Probably our ongoing investigations. Like I said, we focus on, like, violent crimes. Probably had something going on that day." He then said he had surveilled defendant more than a dozen times over the course of several months. On cross-examination, defense counsel asked if Officer Loya was "spying on the neighborhood kids for several months." He responded,

14

"Neighborhood kids is subjective. Ceasefire doesn't target neighborhood kids. Violent crimes and gangs." Defense counsel then asked, "Everybody in that neighborhood is in a gang, correct?" Officer Loya said, "That's a very vague statement. I don't know how to respond to that."

At the conclusion of Officer Loya's testimony, counsel for codefendant West moved for a mistrial on the basis that Loya's testimony violated the court's ruling that "there be no reference to any gang activity, association or the like." Defendant's counsel joined. The trial court noted that defense counsel "open[ed] the door" during cross-examination. Counsel for codefendant West argued that the prosecutor initially elicited the improper testimony and that at a minimum the trial court should instruct the jury to disregard the references to gangs. The trial court denied the motion for mistrial and agreed to admonish the jury. Upon return from a recess, outside the presence of the jury, the trial court read the following proposed admonition to counsel: "[A]lthough Officer Loya testified that in 2020 he was working in the Ceasefire unit which addressed gangs, you are not to make any inferences, conclusions, and there are no allegations that any of the defendants in this case are engaged in gang activity." Both defense counsel confirmed, "That's fine." When the jury returned, the trial court gave the admonition and added: "So I just want to make that comment to you with regard to gangs. That was discussed in terms of what his duties were, but there are no allegations in this case and you are to make no inferences that these defendants are gang members."

Officer Urquiza testified that in October 2020 he worked in the Oakland Police Department's special investigations unit that is part of the Ceasefire program and he investigated violent crimes. As defendant admits, Officer Urquiza did not use the word "gang" during his testimony. He

15

surveilled "a group that had been involved in additional violent crime as well as firearms possession." Officer Urquiza had seen codefendant West in person and through surveillance. He most recently saw codefendant West in person a month earlier when he executed a search warrant and took West into custody "regarding a firearm." West's counsel moved for a mistrial on the grounds that Officer Urquiza's testimony about West's recent arrest for a firearms violation "violates the court's in limine order . . . ."[7] In the alternative, West's counsel asked for a curative instruction to direct the jury not to consider evidence of any uncharged crimes. Defendant's counsel joined in the request for a curative instruction. The trial court denied the motion for mistrial and agreed to draft a curative instruction about codefendant West and the reference to uncharged crimes regarding firearms. No such instruction was given.

The third alleged violation of the trial court's order not to refer to gangs occurred when the prosecutor played a video recording of Officer Rosen's custodial interrogation of codefendant West. During the interrogation, Officer Rosen tells West, "This isn't a gang case but I can tell you that from my experience you have some gang ties." After the video was played, West's counsel moved for a mistrial, which motion defendant's counsel joined "reluctantly." The trial court denied the motion, stating that it was "unfortunate that this happened" and noting that the parties had a copy of the transcript previously. The trial court further noted that it previously gave a curative instruction that there are no gang allegations and that the

---

[7] Defendant's opening brief does not cite to the in limine order West's counsel referenced when he made his motion for mistrial. Although it is not clear from the record, the People appear to assume that the motion for mistrial was based on an alleged violation of the trial court's order regarding gang evidence.

jurors should not make any inference of gang associations and that it would do so again. No additional curative instruction was given.

On June 6, 2022, the parties discussed admission of exhibits and the parties' proposed jury instructions. Regarding the video recording of West's interrogation, the trial court admitted it but ordered that the prosecutor modify the video recording to delete the reference to gangs. Defendant's counsel filed a request that the jury be instructed with CALCRIM Nos. 305 (multiple defendants: limited admissibility of defendant's statement) and 315 (eyewitness identification), both of which were given. No party requested further curative instructions regarding references to gangs. CALCRIM No. 305 states: "You have heard evidence that defendant Joshua West made a statement before trial. You may consider that evidence only against him, and not against any other defendant."

## B. Legal Principles

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) Eliciting or attempting to elicit inadmissible evidence in violation of a court order is prosecutorial error. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) However, we will only reverse a conviction based on prosecutorial error if it is reasonably probable that a result more favorable to the defendant would have been reached without the error. (*Ibid.*)

17

**C.  Analysis**

We find no prejudicial error.  The first alleged violation, during Officer Loya's testimony regarding his work in the "Ceasefire section," provided limited background information, including the basis for the officer's identification of defendant.  The identification of defendant was one of the primary issues at trial.  Testimony regarding the basis for the officer's identification of defendant gave the jury the ability to evaluate the credibility of the officer's identification.  Officer Loya never stated that defendant was a gang member.  More importantly, after denying the motion for mistrial made by West's counsel, the trial court gave a curative instruction that was agreed to by both defendants.  (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375 ["only misconduct that prejudices a defendant requires reversal [citation], and a timely admonition from the court generally cures any harm"].)  Defendant's argument that the trial court's curative instruction was insufficient because it did not specifically state the jury should "disregard" the evidence and that it was "confusing and contradictory" is without merit.  Defendant made no such objections when the trial court gave his counsel the opportunity to comment on its proposed admonition and, therefore, has forfeited this claim.  (*People v. Williams* (2016) 1 Cal.5th 1166, 1188.)  The trial court's admonition twice states the case does not involve gang allegations and that the jury is not to make any inferences that the defendants are gang members.  We presume the jury followed this admonition.  (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

We reject defendant's argument that Officer Urquiza's testimony violated the trial court's order not to refer to gangs.  As defendant admits, Officer Urquiza "avoided using the word 'gang' . . . ."  His references to the Ceasefire section and surveillance of an area "associated to a group that had

18

been involved in additional violent crime as well as firearms possession" do not violate the order because they do not mention gangs or suggest that defendant was a gang member. Nor does Officer Urquiza's testimony that he knew codefendant West from having executed a search warrant and taken him into custody for a firearms violation implicate the order not to refer to gangs. The fact that the trial court agreed to, but then did not, give a curative instruction "to direct the jury not to consider evidence of any other crimes not charged with respect to Mr. West when determining his guilt or innocence of the charged crimes" does not warrant reversal as to defendant. (*People v. Crew, supra*, 31 Cal.4th at p. 836.)

As the People admit, Officer Rosin's reference to codefendant West's " 'gang ties' " in the video recording of West's custodial interrogation should have been redacted. However, we also agree with the People that it appears the prosecutor's failure to do so was an oversight, which the prosecutor readily agreed to remedy by redacting the video recording before it was submitted to the jury. The prosecutor made no mention of gangs during closing argument. We find that the prosecutor's conduct did not amount to the "use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

Although the trial court agreed to give another admonition regarding gang references, it did not do so. However, neither defendant renewed a request for such an instruction at the time they requested other jury instructions. It is unclear if this was again an oversight or if it was a strategic decision to avoid highlighting fleeting references to gangs. In any event, we find no prejudicial error. The trial court had already admonished the jury to make no inferences regarding gangs. Further, the jury was instructed that codefendant West's pretrial statement may only be considered

19

against him and not against defendant.  We assume the jury followed the trial court's instructions.  (*People v. Boyette, supra*, 29 Cal.4th at p. 436.)  West entered a plea during jury deliberations, which suggests that his custodial interview may have had limited value to the jury.  Based on this record, we find that it is not reasonably probable that defendant would have obtained a more favorable verdict had the jury not heard Officer Rosin's reference to West's alleged " 'gang ties' " in the video recording of West's custodial interrogation.  (*People v. Crew, supra*, 31 Cal.4th at p. 836.)

## III.  *Admission of Codefendant West's Custodial Statements*

Defendant contends the trial court erroneously found that codefendant West's custodial interrogation was not coercive and that West made a knowing, voluntary, and intelligent waiver of his *Miranda* rights.  Specifically, he argues that West, who was ill while being held in the interrogation room, was "softened up" before he was advised of his rights and, therefore, his waiver was involuntary.

Even assuming, without deciding, that West's statement was erroneously admitted as to West, it had no impact on defendant.  West was not asked about and never mentioned defendant in his statement, much less implicated him.  Nothing in the record suggests defendant sought to sever his trial.  Defendant did not argue either below or on appeal that West's statement directly implicated defendant such that it should have been excluded under the *Aranda/Bruton* doctrine.  (*People v. Aranda* (1965) 63 Cal.2d 518, 529–531; *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476].)  Most significantly, the trial court instructed the jury with CALCRIM No. 305, which explicitly stated that West's statement could only be considered against him and not against defendant.  We assume the jury

20

followed the trial court's instructions. (*People v. Boyette, supra*, 29 Cal.4th at p. 436.)

## IV. *Firearm Enhancements as to the Second and Fourth Counts (Walnut Creek Robberies)*

Although not raised by the defendant, the People request that we correct a sentencing error regarding the firearm enhancements found true as to the second and fourth counts (§ 211). The second count of the information alleges that defendant and codefendant West committed second degree robbery against Karen F. The fourth count alleges both defendants committed second degree robbery against Bettie K. The second and fourth counts also further allege that codefendant West personally used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b). The firearm enhancement alleged against defendant in the second and fourth counts is that in the commission of the offense a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(2).

The trial court correctly instructed that as to defendant, the second and fourth counts included the special allegation that a "principal was armed with a firearm." The prosecutor argued in closing that as to the Walnut Creek robberies (the second and fourth counts), the personal use allegation applies to codefendant West because he was armed with a gun.

The jury verdicts as to defendant[8] on the second and fourth counts found the principal armed enhancements (§ 12022, subd. (a)(2)) not true. However, they found true the personal use firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (b)), which were not alleged against defendant on the second and fourth counts. The trial court orally pronounced

---

[8] Codefendant West accepted a plea during jury deliberations.

21

defendant's sentence on the second and fourth counts as one year on each count for the robbery plus 16 months on each count for the use of firearm allegations, all concurrent to his seven-year sentence on the first count.[9]

The People ask us to modify the judgment to strike the personal use firearm enhancements as to the second and fourth counts and the 16-month concurrent sentences imposed on each of them. We accept the People's position that it was error for the trial court to sentence defendant for firearm enhancements that were not alleged against him. (*People v. Anderson* (2020) 9 Cal.5th 946, 955, 963 [imposition of firearm enhancements not alleged in connection with relevant counts violates pleading requirements and due process, and appellate court may address error even if it was not raised below].)

## DISPOSITION

The matter is remanded with directions that the trial court vacate the personal use firearm enhancements (§ 12022.5, subd. (a)) and the 16-month concurrent terms imposed as to the second and fourth counts (incorrectly listed as the third count on the abstract of judgment). The trial court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

---

[9] The abstract of judgment states a section 12022.5, subdivision (a) firearm enhancement for the second and third counts but not for the fourth count. However, based on the trial court's oral pronouncement of the sentence, and the fact that defendant was acquitted on the third count (elder abuse), it appears that the abstract of judgment's listing of the third count in the enhancement section was a clerical error.

22

Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A165864/*People v. Kairee Kieon Ward*